## RITENOUR *v.* MATHEWS.

| 42 | 7 |
| 126 | 13 |
| 42 | 7 |
| 131 | 341 |
| 42 | 7 |
| 136 | 597 |

PAYMENT.—*By Third Person.* — *Acceptance by Creditor.*—Payment or satisfaction of a debt may be made by a third person to the creditor, and if accepted by him it will operate as such.

PROMISSORY NOTE.—*Surety.*—*Promise on Condition of Release.*—A surety on a promissory note, fearing he would have to pay the debt, promised his principal, that if he would procure other security and release him from liability, he would surrender certain promissory notes, which he held against the principal. The principal thereupon did substitute other securities, and the surety on being so released from liability on the note refused to comply with his promise.

*Held*, that the promise was without consideration and could not be enforced.

CONSIDERATION.—A promise to one to pay him, if he will do what he is already bound to do by law or by contract, is without consideration, and the law will not compel the promisor to perform his agreement.

APPEAL from the Tippecanoe Common Pleas.

DOWNEY, J.—This case has been twice before in this court; 31 Ind. 31, and 34 Ind. 279. The action was predicated upon two promissory notes held by the appellant against the appellee. Upon the return of the cause to the common pleas the last time, there was a trial by jury upon the same issues that had been previously formed, a verdict for the defendant, motion by the plaintiff for judgment *non obstante veredicto* overruled; motion for a new trial by the plaintiff also overruled; motion by the same party in arrest of judgment overruled, and final judgment for the defendant. The plaintiff duly excepted to these rulings, and having again appealed to this court, has assigned as error the overruling of his motion for a new trial, and also the overruling of his motion for judgment *non obstante veredicto*.

It will be seen by reference to the opinion in 34 Ind., that in the third paragraph of the answer it is alleged, in substance, that the notes on which the action is brought were satisfied in a contract which was made between one Jones and the plaintiff and for a consideration which moved from said Jones. In the sixth paragraph, the satisfaction is alleged to have been by and in accordance with a contract

made by Ritenour with Judy and Keys, and for a consideration moving to the plaintiff from them. In 31 Ind. this court held that the third paragraph was good, and that the sixth was bad, for want of the averment that the agreement was meant and intended for the benefit of Mathews. On the return of the cause at that time to the common pleas, this omitted allegation was inserted as an amendment. In the motion for judgment *non obstante veredicto*, it was insisted, and it is here insisted, that these paragraphs of the answer do not state facts sufficient to constitute a defence to the action. As we have seen, this court held in the case as reported in 31 Ind., that the paragraphs were good defences to the action, with the qualification that the sixth paragraph lacked the allegation which was afterward inserted. We are not inclined to disturb this ruling of our predecessors, but will abide by it, and adopt the result to which it may properly lead us. It seems to be the law that payment or satisfaction may be made by a third person, and that if accepted by the creditor, it will operate as such. Bouv. Law Dic., Title Payment, sec. 18.

Among the reasons for a new trial, it was urged that the verdict was not supported by the evidence. The question under the third paragraph of the answer is, whether a valid contract was made between the appellant and Jones, by which the notes in question were paid and satisfied. The question under the sixth paragraph is, whether there was a valid contract between the appellant and Judy and Keys, by which the notes were satisfied.

The defendant gave in evidence the judgment of Jones against Mathews, Anthony Ritenour, and William Ritenour, rendered in April, 1862, in the Warren Circuit Court, and the receipt of Jones for payment thereof from James Mathews, dated January 12th, 1865. Also an execution on the said judgment, dated 23d day of August, 1864, to the sheriff of Warren county, and the return of the sheriff thereon, dated February 24th, 1865. The plaintiff then admitted before the jury, as evidence, that at the time of the rendition of said

judgment he was the owner of sufficient lands in Warren county to pay said judgment, upon which the judgment was a lien.

Clement G. Jones testified as follows: I reside in Warren county, Indiana, and have since 1834; I am acquainted with the plaintiff and defendant, and with Benjamin Judy and James H. Keys; I was the plaintiff in the judgment read in evidence; I never saw the notes in suit in this cause; the defendant, Mathews, was the principal, and the plaintiff and William Ritenour were his sureties on the note upon which my judgment was obtained; before I got the judgment the plaintiff was uneasy lest he might have the debt to pay, and after it was rendered he was uneasy about the judgment, and saw me about it several times; he asked me if Mathews would put in other good security if I would release the judgment, and I told him I would; we had such conversations several times after the judgment was rendered and before it was satisfied; he wanted me to get Mathews to put in different security so that I would release the judgment, and I went to see Mathews about it two or three times; the last conversation I had with the plaintiff on the subject was in July, 1864, in harvest time; he told me that if I would accept other security from Mathews, and release him, he, plaintiff, would give up to Mathews the notes in this suit, and I agreed that I would take other good securities and release the judgment; I went on from the plaintiff's immediately and saw Mathews and told him; this was in July, before I released the judgment in January; Judy and Keys afterward became the sureties for Mathews, and I released the judgment, and got the clerk to write to the plaintiff in pursuance of the understanding with him and Mathews both; Mathews resided ten miles from me and eight miles from Williamsport; I went to see Mathews two or three times about this, and I thought I was benefiting the plaintiff and Mathews both to make the arrangement. Cross examination: There were a good many conversations between Ritenour and me about this; it came up almost every time I saw him; he told me that if

Mathews would get other securities and release him, plaintiff, from the judgment, he would give up these notes now in suit to Mathews; and he said he had told Mathews the same thing; he, plaintiff, wanted me to see Mathews and tell him the same; that is, he wanted Mathews to get other securities to me, and have me release the judgment; I was at Ritenour's house or field in July, 1864, in harvest; he requested me to go to Mathews and see if he would give other security and have him, plaintiff, released on the judgment; I agreed with Anthony, the plaintiff, that I would release the notes in suit if I got other security, and I went and saw Mathews and told him that if he would put in securities that I would receive, the plaintiff would deliver up these notes ʻ(meaning those in suit), if I would release him from the judgment, which I had agreed to do; I don't know that much more was said; the main question all the time was to get him, plaintiff, released from the judgment; I did not see Judy and Keys about becoming security for Mathews; I went straight to Mathews' home from the plaintiff's; this conversation in July was the last I had with the plaintiff, to the best of my recollection; he said if he was released from the judgment he would give up; this was my understanding all the time from Ritenour; we talked so often about it that I cannot remember all that was said; all our conversations were substantially the same; it was the conversation each time, that if he was released from the judgment, he would give up the notes; I did not pay particular attention when he was talking to me about it; I was at Mathews' once or twice before the time mentioned in July, 1864; Mathews always told me he would try and get other securities; he, Ritenour, was afraid he would have the judgment to pay.

William Ritenour testified as follows: I am a half-brother of the plaintiff, and reside in Warren county, near the line ; the plaintiff came to me and told me that he had made arrangements with Jones to see Mathews, and be released from the judgment, and he, plaintiff, would give up the notes in this suit; he, plaintiff, wanted me to ask Mathews to carry

out the arrangement he had made with Jones, and get the security; he said he had made arrangements to have other security given, and then he was to give up the notes; I saw Mathews, but do not recollect what he said. On his cross examination, he said: I do not know but the feeling between me and plaintiff was good; he told me before the judgment was rendered, that he would give up the notes if Mathews would get other securities and get him released from liability; he said he had made the arrangement with Jones to release him if he got other security; I cannot tell the day or year when it was, but it was some time after the judgment was got, and before it was released; I can't tell the year or day; his conversation amounted to the same thing each time; I had several conversations, two or three times with plaintiff about the matter, as I said before; I was equally liable with plaintiff on the judgment of Jones.

James Mathews, the defendant, testified as follows: I am the defendant in this case; Jones made a communication to me in regard to the judgment and notes in suit; he came to my home on purpose, after he had seen Mr. Ritenour, and told me the arrangement between plaintiff and himself; I went on to get security; I got Judy and Keys to go security on a new note for the debt to Jones; he, Jones, said to me, when he came to see me at the request of Ritenour, that he had agreed with Ritenour to accept other security if I gave other security such as suited him; I think it was in July, 1864, when Jones came to see me the last time; I went to work and tried to get security; I got security; when Jones received the security he went to Williamsport and had the release made; the clerk sent a certificate of the release to Ritenour; my financial condition was bad when the judgment was rendered, and up to the time it was released; I was not able to pay my debts at those times; I had some eleven thousand dollars security debts to pay; I saw Ritenour, and he said if I would give security to Jones he would give up the notes; I told him I could give the new security if he would give up the notes, but could not if he did not

give up the notes; he said to me, you tell Keys and Judy that I will surrender the notes if you get the new security and get me released from the judgment; I told Judy and Keys what Ritenour had said; I did not see Ritenour any more till the judgment was released, and then he objected to giving up the notes, and he would not surrender them; if my memory serves me right, it was in November afterward when I told Keys and Judy of what Ritenour had said; they, Keys and Judy, went on the note. On cross examination, he said: I think it was in November, 1864, that I saw Jones; I think it was the same proposition all the time; when Jones came to see me in July, he did not communicate any new fact or information to me; I knew all about the proposition before; I had learned it from Ritenour himself. I knew that Anthony said he would give up the notes if I got the security; I asked him if he was still willing to do so, as it was a good while; he said he was as good as his word; I testified before that Keys and Judy would go on the new note if he, Ritenour, would surrender the notes in suit.

James H. Keys testified as follows: I am one of the parties who signed the note to Clem. Jones; Mathews stated to me that if he could give new security on this judgment, he could make five hundred or six hundred dollars in getting up the notes in suit; he said Ritenour would release him from the notes; he said he could make that in the operation; I signed the notes on condition that he, Mathews, could make the five hundred or six hundred dollars for his benefit. On cross examination, he stated: I do not know whether he came more than once to see me about going security or not; perhaps he did; I do not know that it was more than once; I signed it so that Mathews could meet it; he thought he could pay the note to Jones if I went on it; I was not afraid of having to pay the note, because, if I did, I had the money to do it with; well, I considered myself safe; Judy and I had a mortgage on the land of Mathews, but not given for this debt; I helped Mathews; he was made my agent; I never had the note to pay; Mr. Judy and I held a mort-

gage on some lands and a bill of sale on some two hundred head of cattle; I furnished the money to buy them; the mortgage on the land was recorded, but cannot tell whether the bill of sale on the cattle was recorded or not; we had no specific security for this debt of plaintiff.

Anthony Ritenour, the plaintiff, testified in his own behalf, as follows: I stated to Jones several times that I would give up these notes, provided Mathews would put in new security; I made the statement to Jones and several other persons; I was uneasy about this security debt; I expected to have to pay it; this was the substance of my statements and conversations to Jones at each time; Jones came to see me in the harvest field, and we talked pretty smart, and he went to see Mr. Mathews at my request, about it, as the sheriff had sent me a notice that he had an execution on the judgment in his hands, and he would call on me for the money; if I had it to pay, I wanted to know it; these conversations were commenced before the judgment was rendered, and were kept up from time to time for pretty nearly three years; they were about the same every time; there was no particular agreement between Mr. Jones and myself that he should release me; I never made any arrangement with Jones; I told my brother so; I had not made any arrangement when I talked with my brother; I just stated my feelings, that I would give up the notes if Jones would release me; I did not tell Mathews to tell anything to anyone; I don't remember of having any conversation with Mathews after Jones came in the field, in the summer of 1864; I never gave any authority to Mathews to make any proposition for me; I never had any conversation with Judy and Keys about this matter until after the judgment was released; Mathews had from two to three hundred large cattle at the time Judy and Keys went the security, worth from five to six cents per pound, or from fifty to sixty dollars per head; Mathews was considered good in the winter of 1864 and 1865; people generally took his paper at that time. This was all the evidence in the case.

We think it quite clearly established by the evidence that the appellant, under the fear that he would have the debt to Jones to pay, promised the appellee that if he would procure him to be released therefrom, by giving other security to Jones, he would surrender up to him the notes on which this action is brought. This is not the contract, however, which is set up in either of the paragraphs of the answer. Nor do we think it can be treated for a single moment as a valid and binding contract upon the appellant. A principal is bound by every rule of moral and legal obligation to protect his surety from the payment of the debt for which he is surety. When the debt has become due, if it is not paid by the principal, the surety may at once have his action to compel the principal to pay the debt and exonerate him from liability therefor; and when the security has been compelled to pay the debt, or any part of it, he may immediately have his action to recover the amount from the principal. It would be a reproach to the law if the principal, under such obligations to his security, could, by failing to discharge them, and by allowing the security to be harassed by action, judgment, execution, and threatened levy, obtain from him the promise of a compensation for doing what he is thus bound to do without compensation, and maintain an action for the promised compensation, or use it to defeat the recovery of what is honestly due from him. Accordingly, it is a general principle of law, that a promise to one to pay him, if he will do what he is already bound to do by law or by contract, is without consideration, and cannot be enforced. *Reynolds* v. *Nugent*, 25 Ind. 328; *Ford* v. *Garner*, 15 Ind. 298; *Cameron* v. *Warbritton*, 9 Ind. 351; *Peelman* v. *Peelman*, 4 Ind. 612.

There is really no evidence in support of the third paragraph of the answer. The consideration for which Jones satisfied the judgment which he held, was the execution to him by Mathews of a note for its amount, with Judy and Keys as his security. Jones was spoken to on the subject, for the reason, we presume, that it could only be effected

through him or with his consent. He was not bound to accept one security for the purpose of releasing another. He might do it, or he might refuse to do it, at his option.

As to the evidence under the sixth paragraph, which refers to an agreement with Judy and Keys, it is quite clear that there was no contract between them and Ritenour. They became parties to the note to Jones at the request and for the accommodation of Mathews, and to enable him to carry out a hard and unconscionable bargain with Ritenour. They did not have to pay anything. Keys swears that they considered themselves safe when they became security for Mathews. They had a mortgage on his land. They had a bill of sale of his goods. It is more than probable, from what appears, that they were thus covering up the property of Mathews, while the sheriff was exciting the fears of Ritenour by sending him notice that he had an execution on the judgment, and would call on him for the money. Ritenour, while he fully admits the contract with Mathews, states that there was no agreement between him and Jones, and that he never had any conversation with Judy and Keys on the subject, until after the judgment was released.

The judgment is reversed, with costs, and the cause remanded, with instructions to grant a new trial, and for further proceedings, in accordance with this opinion.

*J. McCabe,* for appellant.

*W. C. Wilson* and *J. H. Brown,* for appellee.