# H. C. LINDSLY & SON, Respondent, v. KANSAS CITY VIADUCT AND TERMINAL COMPANY, Appellant.

### Kansas City Court of Appeals, January 2, 1911.

1. **CONTRACTS: Consideration.** Plaintiffs subcontracted to construct a portion of defendant's viaduct. A construction company was the original contractor with the railway company. Plaintiffs were prevented from completing their portion of the work by the construction company, which amounted to a breach of the contract and justified them in refusing to go on with the work. Plaintiffs then negotiated with the representatives of the railway, who agreed to treat the plaintiffs fairly if they completed the work. They finished the work, and commenced this action for the reasonable value of the material used and labor expended. *Held*, that the latter agreement constituted an independent contract with a new consideration, and plaintiffs were entitled to recover thereon.

2. ———: ———: ———. Where, after a contract is made, one party thereto, in order to induce a performance thereof, makes a new or additional promise for additional compensation, such promise is without consideration and void, but where the common party to both contracts is not in default in the performance of the first contract, but has elected to abandon because of the breach of the other contracting party, he has a right to contract with a third party interested in the completion of the work, for the doing of the unfinished work covered by the first contract.

Appeal from Jackson Circuit Court.—*Hon. Jas. E. Goodrich*, Judge.

AFFIRMED.

*Warner Dean, McLeod & Timmonds* for appellant.

*Ellis, Cook & Barnett* for respondent.

JOHNSON, J.—This is an action on contract to recover the reasonable value of work and labor performed by plaintiffs in the construction of the Inter-

City Viaduct connecting the cities of Kansas City, Missouri, and Kansas City, Kansas. The answer is a general denial and a plea of no consideration. A trial to a jury resulted in a verdict and judgment for plaintiff for $3011.05, the amount claimed in the petition, and the cause is here on the appeal of defendant.

In April, 1905, the defendant, the Kansas City Viaduct and Terminal Railway Company (hereinafter referred to as the Viaduct Company) entered into a contract with the Kansas Construction and Equipment Company (hereinafter called the Construction Company), by the terms of which the Construction Company, for a stated consideration, agreed to build the viaduct according to certain plans and · specifications and to deliver the completed structure to the Viaduct Company on or before July 1, 1907. The viaduct is an elevated structure of steel and concrete over eight thousand feet long, and its main features are a wide, paved roadway for vehicles and on the north side of that roadway, railway tracks for the accommodation of street car traffic.

On July 10, 1906, the Construction Company entered into a written contract with plaintiffs whereby plaintiffs, in consideration of certain payments of money, agreed to furnish all labor and perform all work ''necessary to place, frame, and bolt in position all of the timber ties and guard rails and to lay, splice and full spike all of the steel rails for the two street railway tracks on the steel portion of the viaduct, all in accordance with the plans and specifications . . . and will fully finish and complete the same within five days form the date the last of the steel work is ready for the tracks, unless in the opinion of the engineer, the party of the second part (plaintiffs) be delayed or prevented by circumstances that are absolutely beyond its control.'' The materials for the track laying and other work were to be

provided by the Construction Company and placed on the ground along and under the structure and the work of hoisting the material and putting it in place was to be done by plaintiffs. The specifications contained the stipulation: "The entire work herein outlined is to be completed within five days from the date the last of the steel work is ready for the tracks, and for each day of delay in so completing the work, the company shall withhold permanently from the contractor's total compensation the sum of fifteen and no one-hundredths dollars, unless in the opinion of the engineers the contractor be delayed by circumstances and conditions absolutely beyond his control. The amounts thus withheld shall not be considered as a penalty but as liquidated damages, fixed and agreed to in advance by the contracting parties."

The contract contained, among others, the following provisions:

"In case the party of the first part, notwithstanding the failure of the party of the second part to complete its work within the time specified, shall permit the said second party to proceed, and continue, and complete the same, as if such time had not elapsed, such permission shall not be deemed a waiver in any respect, by the first party, of any forfeiture or liability for damages thereby incurred, arising from such non-completion of said work within the time specified, and covered by the "liquidated damages" clause of the specifications; but such liability shall continue in full force against the said second party, as if such permission had not been granted.

"In the event of any delay in completing the work embraced in this contract, the party of the second part shall be entitled to no extra compensation on account of such delay; as it is hereby assumed that in submitting its tender it took its chances for the occurrence of such delay."

Plaintiffs began work immediately under this contract and prosecuted it as vigorously as the Construction Company would permit until November 1st, following, when the engineers of the Construction Company stopped plaintiffs' work entirely and kept them idle during the ensuing two months. It is, and all along has been the contention of plaintiffs that they were materially and unreasonably delayed by the Construction Company to such an extent that great loss was entailed in doing the first half of the work which was completed by November 1st, and that they would have suffered still greater loss from the wrongful conduct of the Construction Company had they gone ahead under the contract with the last half of the work in the dead of winter. It appears from the evidence of plaintiffs that the Construction Company used the framework for the railway tracks as a place for the beds used in mixing concrete for the wagon roadway and that the materials for plaintiffs' work which had been assembled on the ground under the structure had been displaced and much of it had been sunk and frozen into the marshy ground. On January 3, 1907, one of the consulting engineers of the Construction Company requested the senior member of plaintiffs' firm to proceed with the work. Plaintiffs' version of what was said and done pursuant to that request appears in the following quotations from the testimony of Mr. Lindsly:

"Q. Give that conversation, Mr. Lindsly. A. Mr. Hedrick came into the office to consult with me and take up the question of going ahead with the work.

"Q. What did he say to you about that? A. He said it was time to go ahead with the work of decking again and wanted to know if I would go ahead—probably not in just those terms, but that was the substance of it. And I told him very plainly that I would not think of going ahead, resuming that work under

the original contract—that wasn't to be thought of for a moment. He smiled and said, 'I don't blame you.'

"Q. What followed after that in the further discussion of this matter with respect to your resuming work and laying rails and ties on this structure? A. Later on, I was requested to come up to Mr. Harmon's office in the Keith & Perry building, and Mr. Hedrick, I think, had his office there at the same time.

"Q. What time did you reach Mr. Harmon's office in response to this request? A. On the third of January, 1907.

"Q. Mr. H. L. Harmon? A. Mr. H. L. Harmon.

"Q. He at that time was what? A. President of the viaduct company.

"Q. Whom did you meet there at that time at Mr. Harmon's office? A. I met Mr. Hedrick first and Mr. Harmon and Mr. Howard, a resident engineer on the work, was also present.

"Q. What was said by you, why you would not resume work under the old contract? A. I told them I would not resume work under the old contract because the conditions were so vastly different from what they were when the contract was made; that it then had come on into winter; that my work had been stopped entirely; that the work we had done was damaged; that our timber was scattered over half a mile in that bottom where it had been distributed previously to putting it up on the track, before we were stopped, and it had been frozen into the ground and some of it destroyed and abused, broken up by the conditions that had prevailed; that the weather was such that men could not work—the structure there was a dangerous place to work; that a man could not do the service that could have been done earlier in the season; that it would be a vastly more expensive thing at that time to carry on the work than it would under the conditions that prevailed before, when the contract was made.

152 App.—15

"Q. All this, I understand, you recounted in this talk? A. Yes, sir.

"Q. What was said whether or not you would go ahead under the old contract over there at this time? A. I told them absolutely this: I would not go on under the old contract.

"Q. Something was said in the opening statement about that they would proceed on that bond? A. There was some reference made to the bond but no threat made whatever. It wasn't treated in that way—there wasn't any effort made at that time to bring any pressure to make me go ahead under the old contract.

"Q. What was said then, that should be done? A. In order to go ahead with the work which was still to be completed, they asked me what I would do.

"Q. (By the Court.) What do you mean by 'They?'"

"Q. Who was doing the talking at this time? A. Mr. Harmon and Mr. Hedrick, and, of course, myself. But Mr. Hedrick, particularly, finally asked me what I wanted—that is, in regard to consideration— and go ahead with the work again and completing the work that was still to be done. I told him that I only wanted fair treatment in the matter; that they knew all the situation, that they knew that it was out of the question to go ahead with it under previous conditions, but that I could, by reason of the fact that I was familiar with it, and could get the same men on the work, do it more cheaply than anybody else; and that I would go ahead and complete the work if they would treat me fairly in the way of recompense.

"Q. What was said about the desire of the Viaduct Company, if anything, to have this done speedily? A. Mr. Harmon and Mr. Hedrick both said it was necessary to have that done—it was necessary to the interests of the Viaduct Company to have this done. Mr. Harmon stated that the matter had dragged until their

time for completion was very short, and they had to have the viaduct.

"Q. Who did he mean by "they" or did he say? A. They?

"Q. State whether or not the name of the Viaduct Company was used there in the conversation? A. He stated to me that it was necessary to the Viaduct Company that he have this work completed at once.

"Q. Now, following that, what was said, if anything, as to whether you should go on, and if so, how? A. After I had made the statement to them that I would go ahead with the work under these conditions, if they would give me fair treatment; that I could do it more cheaply than anybody else; that I would do it economically and furnish them the bills and leave it to anybody that the work was economically done, and even leave it to Mr. Harmon; that all I wanted was fair treatment in the matter as between man and man. Mr. Harmon said, that is all right; I will treat you fair; that is satisfactory to me, go ahead with the work.

"Q. In that conversation did Mr. Hedrick make any mention of your going ahead with the Construction Company? A. No, sir.

"Q. With whom did you deal as representing the Viaduct Company in your work prior to January 3? A. With the consulting engineers on the work.

"Q. State whether or not you had dealt with Mr. H. L. Harmon in regard to doing work for the Viaduct Company before that date? A. No, sir.

"Q. You may continue, Mr. Lindsly, in regard to this conversation on January 3, at Mr. Harmon's office. A. I think I gave practically the closing of it; that Mr. Harmon told me to go ahead with the work and push it along as rapidly as possible, and he would treat me fair, do what was right, he was satisfied to have it left in that way.

"Q. Did Mr. Harmon, at any point in the conversation say, or use any language referring to his speak-

ing for the Construction Company, in this conversation? A. No; he didn't refer to the Construction Company; he spoke of the Viaduct Company being compelled to have the structure in a short time, that it was necessary to push the work.''

Plaintiffs thereupon resumed the work and completed it April 10th. They allege, and their evidence tends to show, that the actual and reasonable cost of the work done after January 3d was $4216.40, and that the reasonable value of their own services was ten per cent of that amount, making a total of $4638.04. They acknowledge payments of $1626.99, leaving a remainder due them of $3011.05. Plaintiffs contend that the Viaduct Company owes them this money for the reason that the conversation with Mr. Harmon above quoted constituted an independent oral contract for the completion of work between plaintiffs and the Viaduct Company. Defendant contends that no new contract was made, that there was no consideration for such contract and that the work was completed under the old contract with the Construction Company. Mr. Harmon, introduced as a witness by defendant, testified that he was the agent of the Construction Company as well as president of the Viaduct Company, and that the western offices of the two companies were in the same rooms. Relative to the conversation on which plaintiffs rely, he testified:

"Q. No, I will ask you to detail the conversation as well as you can, of all parties, which took place there on the third day of January at this office in the Keith & Perry building. A. It opened by Mr. Hedrick saying that Mr. Lindsly was going to quit—or didn't want to go ahead and finish his work under their contract. Mr. Lindsly made several statements in regard to the reasons; I could not detail them now; and I remember calling his attention to his contract, which gave us the privilege of going ahead and completing the work and calling on their bondsmen for money to do so; and

either Mr. Hedrick or I called attention to the fact that he could do that better than anybody else, and as I remember it, he was willing to do it, if he could be treated fairly; and, as I remember, he said he was willing to leave the question of being treated fairly to any fair man, as he expressed it, he said, 'even to Mr. Harmon,' referring to me. I told him that I was willing, if he did his work in the manner in which we wanted it done, in the time we wanted it done, to treat him fairly, but if I was to be the judge of his actions in that I would base it entirely upon the way he did the work, and consider somewhat the way he had performed the work prior to that time. He said he was willing to leave it to me to decide; and as I remember the conversation broke up, Mr. Hedrick stating to him that he had better go down there and go to work now and get this done; and it was ended and they went out.

"Q. Now, what, if anything, was said by anyone present regarding the doing away with or abandonment of the old contract, the written contract, between Lindsly & Son and the Construction Company, for the doing of this work? A. It was not mentioned, as I remember it, at all.

"Q. What was said, if anything, by anyone there, regarding a new arrangement to be made by which the railway company should take up the burden of paying for this work? A. I never heard of anything of the kind at the time.

"Q. What, if any, mention was made of the railway company in that connection, in that conversation? A. I don't remember that it was mentioned.

"Q. Was it ever mentioned at any other time and place, in your hearing or by you? A. Not that I remember—in regard to that particular contract.

"Q. That is what I am talking about, the contract for the decking and track laying? A. Yes."

It appears that the Construction Company whose head office was in Boston made its disbursements in

Kansas City through Mr. Harmon as "agent" and that plaintiffs received numerous payments through that channel, but it is quite clear from all the evidence that the only executive duties exercised by Mr. Harmon were those pertaining to his office of president of the Viaduct Company. Plaintiffs did not know that he claimed to be invested with the performance of any executive or managerial functions by the Construction Company, and, without going further into the details of the evidence, we think it is manifest that all the parties to the conversation understood two things perfectly, i. e., that plaintiffs had been so badly treated by the Construction Company that they were justified in treating the contract as broken and, second, that Mr. Harmon was acting on behalf of defendant as its president and was not assuming to act as an executive officer of the Construction Company. All acknowledged that plaintiffs were in no manner at fault for the delays in the prosecution of the work and, to secure a speedy completion of the viaduct, Mr. Harmon, with plaintiffs' refusal to go on without a new contract ringing in his ears, urged plaintiff to finish the work under the promise that he "would treat him right." That Mr. Harmon had no authority from the Construction Company to modify plaintiffs' contract with that company is conceded in his cross-examination, from which we quote:

"Q. Where did you get your authority from the Construction and Equipment Company to consent to a modification of Mr. Lindsly's contract here. Exhibit 1? A. I never got any.

"Q. Where did you get authority from the Kansas Construction and Equipment Company to agree to pay Mr. Lindsly more money for the work if he did it according to your idea? A. From general instructions.

"Q. Who gave them to you? A. Mr. Egan, 1 think; I could not state definitely what was given to me.

"Q. Did Mr. Egan's instructions come to you personally or by letter? A. I don't remember.

"Q. Did anybody for the Construction Company ever tell you (you) could take Mr. Lindsly's contract and if he would hurry up the construction there, pay him more money than the contract called for? A. No."

The court overruled the demurrer to the evidence offered by defendant and submitted issues to the jury the nature of which is disclosed in the following instruction given at the request of plaintiffs:

"If you find from the evidence that on or about January 3, 1907, plaintiff and defendant verbally agreed that plaintiffs should proceed directly under the direction of defendant and complete the work of laying the ties, timber and tracks then unfinished as specified in instruction number 1, upon the viaduct referred to in the petition, and that plaintiffs for so doing should be paid by defendant the fair and reasonable value thereof that plaintiffs thereupon and thereafter, and pursuant to said agreement (if from the evidence you find such to have been made) did, between January 3, 1907, and April 11, 1907, under the direction of defendant, go forward with said work, and did furnish the labor, equipment and tools necessary, and did lay the ties, timber and steel and perform the work of laying said tracks, then your verdict will be for the plaintiffs."

The first proposition advanced by defendant in support of its argument that the demurrer to the evidence should have been sustained is that the oral promise of Mr. Harmon to plaintiffs in the conversation of January 8, 1907, was not sufficient to constitute a contract between plaintiffs and the Viaduct Company for the completion of the work plaintiffs had undertaken

to do under their contract with the Construction Company. It must be confessed that a contract is not stated with the definiteness and certainty one would expect to find in a transaction so important conducted by business men of experience in large affairs. There was no direct assurance exacted of Mr. Harmon, nor did he give such assurance, that the Viaduct Company would pay plaintiffs the reasonable value of their services if they would resume work and rapidly push it to completion, but we think the evidence clearly shows a mutual understanding and intention that plaintiffs should be suffered to abandon their contract with the Construction Company and to complete the work under a new agreement with the Viaduct Company. The question of whether or not a contract was made is to be solved by ascertaining the mutual intention of the parties to be gathered in this instance from the conversation of January 3d, considered in the light of its attendant circumstances.

Plaintiffs had been unreasonably delayed by the Construction Company and had suffered great loss on account thereof. True, their contract with that company provided that they "took the chances for the occurrence of delays" but that stipulation obviously related only to delays that might occur in the reasonable conduct of the work and was not intended to give the Construction Company license to obstruct and delay plaintiffs unreasonably, nor wantonly or even negligently to make their work unnecessarily difficult and costly. The conduct of the Construction Company, as disclosed by the evidence, amounted to a breach of contract and justified plaintiffs in their refusal to proceed with their work. They made their position clear to Mr. Harmon, tacitly, at least, he acknowledged its soundness, and, for the reasons that the Viaduct Company was anxious that the viaduct should be finished speedily and that plaintiffs were in position to do the track laying faster than any other contractor could do

it, Mr. Harmon urged them to go ahead and promised to treat them right. As president of the Viaduct Company, he had authority to contract with plaintiff's but he had no authority to bind the Construction Company to a new contract. In the light of such facts and circumstances, we say the conclusion is not debatable that the parties mutually understood that a new and independent contract was entered into between plaintiffs and the Viaduct Company.

The new contract was supported by a consideration. Defendant argues: "Mr. Harmon's promise was not supported by any consideration, and was a mere *nudum pactum,* not enforceable in law.

It frequently occurs that, after contract made, or obligation entered into, one of the contracting parties, in order to induce a performance of the contract, makes a new or additional promise of additional compensation to the other contracting party. Such new or additional promise is always held void under the well-recognized rule that a promise made in consideration of the doing of an act which the promisee is already under legal obligation to do, is not supported by a valid consideration. Striking illustration and enforcement of this rule is found in the following cases: [Lingenfelder v. Wainwright Brewing Co., 103 Mo. 578; K. C. & C. B. R. R. Co. v. Morley, 45 Mo. App. 304; Nelson v. Pickwick Co., 30 Ill. App. 333; Davis & Co. v. Morgan, 117 Ga. 504; Price v. Press Pub. Co., 103 N. Y. Supp. 296; Ritenour v. Matthews, 42 Ind. 7.]

And the principle underlying this rule is applicable to, and the rule is enforced in, that line of cases where a third party, in order to induce one to comply with his contract, has made a promise to him."

Two answers may be given to this argument, first: The rule invoked by defendant cannot apply in a case, such as the one in hand, where the common party to both contracts is not in default in the performance of

the first contract but has elected to abandon it on account of the breach of its terms by the other contracting party. Having chosen to quit the work on account of the default of the Construction Company, plaintiffs had the right to continue in that position and if a third party, interested in the completion of the work, induced them to resume by means of a new contract, we do not perceive on what ground it may be said that the new contract was collateral to the old. It was an independent contract with a new consideration, i. e., the agreement of the new promisor to pay an increased consideration. Second: It was contemplated that the new contract would be treated as a rush order. That is to say, plaintiffs agreed to finish the work more rapidly than they would have been bound to do under the old contract. That, in itself, was a sufficient consideration for an independent as distinguished from a collateral agreement. [Yoeman v. Mueller, 33 Mo. App. 343; Hill v. Bank, 100 Mo. App. 230; Young v. Ledford, 99 Mo. App. 565.] The learned trial judge properly overruled the demurrer to the evidence and correctly defined the issues in the instructions.

Objections urged against rulings on the evidence are found to be without merit. The case was fairly tried and the judgment is for the right party. Affirmed. All concur.