## L. G. LEBRECHT, Appellant, v. NEW STATE BANK, WOODARD, OKLAHOMA, Respondent.

**Kansas City Court of Appeals, June 10, 1918.**

1. **BANKS AND BANKING: Deposits: Capital Impaired.** Under the Oklahoma law, a bank is deemed to be insolvent when the actual cash market value of its assets is insufficient to pay its liabilities, when it is unable to meet the demands of its creditors in the usual and customary manner, and when it shall fail to make good its reserve as required by law. The losses sustained by a bank are charged first to its undivided profits and then to its surplus. A bank's capital stock is impaired when its losses exceed its undivided profits and its surplus.

2. ————: **Pleading and Proof.** A defendant cannot plead in defense one contract and offer in evidence a totally different one.

3. ————: ————: ————: If under a written contract, a bank commissioner's obligation to return plaintiff's money is already fixed, the promise to perform that obligation could not support a new promise made by plaintiff, because there would be no new consideration for that promise.

4. **INSTRUCTIONS: Pleading and Proof.** A defense which is based upon a contract different from the one stated in the pleading, and a case is presented upon this theory, over the plaintiff's objection, all instructions which related to the evidence offered are erroneous.

Appeal from Jackson Circuit Court.—*Hon. Willaim O. Thomas,* Judge.

REVERSED AND REMANDED.

*Hal R. Lebrecht* and *M. Schwind* for appellant.

*McCune, Caldwell & Downing* for respondent.

TRIMBLE J.—This action is to recover $2300 claimed as the balance due on a deposit of $10,000 made by plaintiff with the defendant bank. The petition alleges that on the 8th of October, 1916, said bank received from plaintiff as its depositor the sum of $10,000 which was credited to plaintiff's account; that on December 5, 1916, plaintiff drew his check thereon for $10,000, payment of which was refused, and defendant doth still refuse to pay same, or any part thereof, except the sum of $7700, leaving $2300 due with interest thereon at the legal rate from said December 5; for which, judgment is asked.

The answer, after a general denial, set up that on September 25, 1916, plaintiff was the owner of 91 out of a total of 150 shares of the capital stock of said bank; that the bank was then in the hands of the Oklahoma Bank Commission because of the wrongful conduct of Murphy, the cashier, in making unsafe and fictitious loans and in misappropriating its funds, and the Bank Commissioner was threatening to liquidate the bank and wind up its affairs as he was empowered under the law to do.

That on said date plaintiff entered into a contract with said Bank Commissioner whereby the former agreed to deliver to the latter $10,000 to be used in reimbursing and securing said bank against any losses

caused to defendant by the wrongful acts of said Murphy as cashier "and to be applied *pro tanto* in reimbursement for any misappropriations or wrongful withdrawals of funds from defendant by said Murphy, and to be returned to plaintiff, subject to any deductions for such purposes, only with the approval of said Bank Commissioner, in consideration of which said Lankford, as such Bank Commissioner, acting under the laws of the State of Oklahoma, agreed to permit and did permit the defendant to be reopened and continue in business, without being dissolved and liquidated, and its affairs wound up, as said Lankford might have insisted upon being done.

The answer further alleged that pursuant to said contract plaintiff delivered said $10,000 to the Bank Commissioner and he deposited same with defendant subject to the commissioner's orders and thereupon permitted the bank to be reopened and continue in business to plaintiff's great benefit, enabling the latter to afterwards sell all of his stock in the bank as an active and going concern; that thereafter it was discovered that Murphy, the cashier, had wrongfully issued a negotiable cashier's check of defendant in the sum of $2300 which was negotiated to a holder in due course who was entitled to enforce payment of same against defendant.

The answer then alleged that "thereafter, plaintiff made demand upon said Lankford for the return of the said $10,000 and the said Lankford agreed to return $7700 thereof immediately and the balance upon plaintiff's securing the cancellation and surrender of said $2300 cashier's check without payment by defendant, which plaintiff then and there agreed to do, for the benefit of this defendant, and thereafter said Lankford returned to plaintiff said $7700."

"That nevertheless plaintiff failed to secure the cancellation and surrender of said cashier's check and this defendant was obligated to pay same and did pay same with the consent of said Lankford to its damage

in the sum of $2300;'' that said commissioner has refused and still continues to refuse to permit the balance of said fund, to-wit, the sum of $2300, to be returned to plaintiff.

The reply was a general denial.

A trial was had, the jury returned a verdict for defendant and plaintiff has appealed.

Plaintiff was in business in Kansas City, and some time prior to the making of the contract between him and Lankford the Oklahoma Bank Commissioner, Murphy, the cashier, borrowed of a bank in Kansas City the sum of $8000 on plaintiff's endorsement. Murphy also put up ninety-one shares of stock owned by him in the defendant bank, as collateral. The borrowed money was placed to the credit of defendant bank and was drawn out by its assistant cashier. Afterwards, plaintiff paid off the $8000 note on which he was security and obtained the stock put up as collateral and some time later became the owner of said stock.

Shortly thereafter Murphy summoned plaintiff to come to Woodward. Arriving there, he found the bank in charge of Deputy Bank Commissioner, McBride. The bank was closed on Saturday and that night plaintiff and his attorney went to Oklahoma City to see the Bank Commissioner, and there a written contract was entered into by which plaintiff was permitted to put up $10,000 so as to guard against the insolvency of the bank and so that the Bank Commissioner would allow the bank to be reopened. At the time the contract was made it was not definitely known just what was the exact condition of the bank, but an audit was to be made to ascertain the exact state of affairs.

Said contract was dated September 25, 1916, and was between Lankford as State Bank Commissioner, first party, and plaintiff as second party. It recited that whereas Murphy was the principal stockholder and the Bank Commissioner "for good and sufficient reasons" had taken charge of the bank and made an order for the removal of said Murphy as cashier, and

in consideration thereof it was agreed that the stock owned by Murphy should be transferred to some responsible man in Woodward, subject to the mutual approval of the parties, and to be held by such man "until the said Bank Commissioner shall be satisfied of the solvency of said bank and shall give his consent and approval of a permanent transfer of said stock." It was further provided that before the bank should be permitted to resume business, all of the Directors should resign and new directors, acceptable to the Bank Commissioner, should take their place. The contract then provided that

"For the purpose of placing said bank in a solvent condition and for the purpose of repairing the capital stock of said bank the party of the second part shall deposit in said bank within the next two days the sum of $10,000. Said sum or any part thereof to be permitted withdrawn by party of the second part when said bank is wholly solvent and the withdrawal thereof will not in any manner impair the capital of said bank. Said withdrawal to be with the approval of the Bank Commissioner. When the condition of this contract shall have been performed by party of the second part said bank shall be delivered to the duly constituted Board of Directors thereof."

Shortly after, the plaintiff deposited said $10,000 in the defendant bank, the same being placed to plaintiff's account; but it was, of course, made pursuant and subject to said contract. A Mr. Hastings, of Woodward, was agreed upon as the one to hold the stock as specified in the contract and he was installed as the Banking Department's representative and the bank reopened with the Deputy Bank Commission, McBride, present and in supervising control. It is clear that on the reopening of the bank there were several matters to be adjusted and settled, namely, (1) about $6100 of paper that McBride considered uncollectible had to be charged off as assets of the bank, (2) a $4000 Cozarth Grain Company acceptance, which was apprently an accommodation note of Murphy's, had to be taken out of the bank and value sub-

stituted therefor, (3) a $6120 discrepancy in the account of a correspondent bank had to be made good, and (4) paper of the Murphy family, amounting to $1475 (possibly $1600 with interest)), had to be taken up and cash put in its place.

While the bank was thus open and running under the permission given by virtue of the deposit contract, McBride instructed Murphy not to withdraw any money from his personal account but to leave same there to take care of any paper which the examination might disclose he had wrongfully issued. The Deputy left town for one day, however, and while he was away Murphy issued a cashier's check for $2300 to a fictitious person and for accommodation, and the amount was charged against the funds in his account. The moment McBride discovered this, he ordered that the check should not be paid when presented and told plaintiff that he would stop payment on it.

Thereafter, plaintiff began negotiations with two acquaintances, Lobaugh and Zacharias, to sell them his stock and they finally reached a point where the purchase was likely to be made and the Deputy Bank Commissioner McBride was sent for to sanction the transfer.

It should be here stated that it turned out that the notes, though uncollectible, were good, and the bank did not lose a penny on them; nor did it lose anything by reason of the $6120 discrepancy, as Murphy met it in some way. The evidence is that he took it up with money obtained on the loan he got through plaintiff's endorsement as stated hereinbefore set forth. So that at the time of the proposed sale of plaintiff's stock to Lobaugh and Zacharias, there remained to be adjusted only the $4000 Cozarth acceptance matter and the $1475 worth of Murphy family paper. In addition to this, the cashier's check for $2300, which had come into existence after the making of the contract, the putting up of the deposit and the reopening of the bank under the contract, was outstanding and unpaid, having been, by the Commissioner's

direction, withdrawn as a charge against Murphy's account, leaving a balance of $2300 therein.

According to defendant's evidence, the purchasers Lobaugh and Zacharias agreed with plaintiff to deposit $1475, or $1600 including interest, in the bank to take up the Murphy family notes; to also deposit $1700, which with the $2300 balance in Murphy's account (remaining there when the cashier's check of $2300 was taken out as a charge thereon), would take care of the $4000 Cozarth matter; and to pay plaintiff $8500 for his stock, he to secure the cancellation of the cashier's check and not allow it to be carried against the bank. According to defendant's evidence, the plaintiff agreed to this and promised to get possession of the cashier's check so that it would never be presented to the bank for payment. The purchasers Lobaugh and Zacharias did make the deposits above mentioned, the Murphy family paper was paid off and the Cozarth matter discharged, plaintiff was paid the $8500 for his stock, and the transfer thereof to Lobaugh and Zacharias was sanctioned by the Deputy Commissioner, and the purchasers took charge of the bank. This was about the 8th of October, 1916.

Plaintiff's evidence denies that he made any agreement to care for the $2300 cashier's check. He also denies that the payment or cancellation of said check was made a condition of the Commissioner's approval of the transfer of his stock. He says that all he was told was when he afterwards asked for the return of his $10,000 deposit he was then informed that the cashier's check for $2300 would have to be cared for by him, and, if not, the amount thereof would be taken out of his deposit.

On December 4, 1916, the plaintiff not having taken care of the $2300 cashier's check, and payment thereof being about to be enforced against the bank, the Commissioner ordered it paid out of plaintiff's deposit which was done. At this time there was and had been a surplus of $3000 in the bank and possibly $2000 of undivided profits, and the bank was, and had

been, in a solvent condition with its capital unimpaired.

Under the Oklahoma law shown in evidence, a bank is deemed to be insolvent when the actual cash market value of its assets is insufficient to pay its liabilities, when it is unable to meet the demands of its creditors in the usual and customary manner, and when it shall fail to make good its reserve as required by law. [Harris-Day Code, sec. 278 of Oklahoma.] The losses sustained by a bank are charged first to its undivided profits and then to its surplus. [Sec. 280, Harris-Day Code, Oklahoma Stats.] A bank's capital stock is impaired when its losses exceed its undivided profits and its surplus. [Sec. 288, Harris-Day Code.]

There appeared to be ample grounds to justify the Bank Commissioner in taking charge of the bank, and if the $4000 Cozarth claim together with the notes deemed uncollectible and the $6120 discrepacy in the account of the correspondent bank had all been lost, the bank's capital would have been seriously impaired, of not entirely wiped out. But, as stated, it turned out that the notes thought uncollectible were good and the bank did not lose anything thereon, nor did it lose anything by reason of said discrepancy. When the $4000 Cozarth matter was taken up with the $1700 paid in by the purchasers Lobaugh and Zacharias and with the $2300 balance in Murphy's account, and the $1475 Murphy family notes were taken up by the $1475 (or $1600 including interest), paid by said purchasers, the bank's capital was not only not inpaired but there was at least $3000 surplus and some $2000 undivided profits at the time plaintiff sold his stock. There is evidence in defendant's behalf, however, tending to show that the $2000 undivided profits was used in clearing up some of the obligations. But the defendant's evidence shows, and it is therefore beyond question, that the bank's capital was not impaired and that when the Bank Commissioner directed the $2300 cashier's check to be paid out of plaintiff's

$10,000 deposit the bank had at least a surplus of $3000 and had earned undivided profits in addition thereto from the time the purchasers Lobaugh and Zacharias bought it.

The evidence of the Bank Commissioner (defendant's witness), shows clearly that he refused to allow the full amount of plaintiff's deposit to be returned because he "had been told" that plaintiff "had agreed to make it good," that is, to pay or take care of the cashier's check. He said he had nothing else in mind except the $2300 cashier's check when he refused to permit plaintiff to take down his deposit, and did not put his refusal on the ground that for the bank to pay the said check would impair its capital stock, nor on any other ground except that plaintiff had agreed to pay it.

Having stated the facts thus at length, and with perhaps unnecessary minuteness and detail, we are now ready to discuss the case presented.

From the terms of the written contract plaintiff made with the Bank Commissioner, and under which he deposited his $10,000, it is clear and unquestioned that the purpose of making the deposit was not to make good *any* and *every loss* of the bank, but only "for the purpose of placing said bank *in a solvent condition* and for the purpose of *repairing the capital stock* of said bank." The contract clearly shows that the Bank Commissioner agreed that he would permit said sum or any part thereof to be withdrawn "*when said bank is wholly solvent* and the withdrawal thereof will not *in any manner impair the capital stock* of said bank." Unless the $10,000 was needed to put the bank in a *solvent condition* or to *repair its capital,* it was to be returned to the depositor. The contract nowhere gave the Commissioner any authority to repay any other loss of the bank out of plaintiff's money. The Bank Commissioner is an officer with certain powers limited and defined by statute. Section 302, Harris-Day Code, provides that whenever he shall

become satisfied of the insolvency of a bank, he may, after due examination into its affairs, take possession of the bank and its assets and proceed to wind up its affairs. Section 306, Harris-Day Code, provides that after he has thus taken possession, the stockholders may repair its credit, restore or substitute its reserve, and otherwise place it in condition to do a general banking business; and if the Commissioner, after a careful examination of its affairs, is of opinion that its stockholders have complied with the laws, that the bank's credit and funds are in all respects repaired, its reserve restored or sufficiently substituted, he may issue his written permission to reopen the bank for business the same as when first incorporated. Plaintiff's contract with the Commissioner was made in the light of these laws, and they also throw light on the answer filed by defendant. For this answer sets forth the conditions under which the Commissioner was about to liquidate the bank and the situation inducing the plaintiff as a stockholder to be willing to put his $10,000 deposit whereby Commissioner permit the bank to reopen.

Now, notice what the answer pleads is the contract set up in defense of the suit to recover the balance of the deposit. It says the deposit was "to be used in reimbursing and securing defendant against *any losses* caused to defendant by the wrongful acts of Murphy as cashier," and "to be applied *pro tanto* in reimbursement for *any* misappropriations or wrongful withdrawal of funds from defendant by said Murphy, and to be returned to plaintiff, subject to *any* deductions for such purposes." The answer then says the Commissioner permitted the bank to reopen and "*thereafter* it was discovered that the said M. D. Murphy had wrongfully issued a negotiable cashier's check of defendant in the sum of $2300" etc; that plaintiff afterwards demanded the return of his money and the Commissioner agreed to immediately return

him $7700 of it and that he would return him the balance upon plaintiff's securing the surrender and cancellation of the $2300 cashier's check "which plaintiff *then and there agreed to do* for the benefit of of this defendant."

Under one view of this answer it is certainly open to the construction that it pleads a certain contract made by plaintiff with the Bank Commissioner whereby plaintiff agreed to make good *any losses* of the bank on account of bad paper or paper wrongfully issued, that the cashier wrongfully issued a $2300 cashier's check, and that *under the contract* the Commissioner required the $2300 check to be taken care of by plaintiff. For, as far as the allegations of the answer are concerned, under what right or authority *except the contract* did the Commissioner have to demand of the plaintiff that he take up the $2300 check before being entitled to receive the balance of his deposit? And even though the answer does say that when that requirement was made the plaintiff "then and there agreed" to do so, this was nothing more than saying the plaintiff again promised to comply. So that, as stated, the reasonable construction of the answer is that the written contract with the commissioner required plaintiff to pay any and all losses; that the $2300 check was not paid; that under the contract that much of the plaintiff's deposit was used to pay it, and for this reason the plaintiff is not entitled to recover. If this is the proper construction to be placed on the answer, then the proof did not bear it out since the written contract, as above shown, does not provide that plaintiff was to make good all losses without regard to whether they impaired the bank's capital or rendered it insolvent. If the answer is to be so construed, then the defendant's evidence as to the plaintiff's *oral* contract to take care of the $2300 check, should not have been admitted. A defendant cannot plead in defense one contract and offer in evidence a totally different one.

[Halliwell Cement Co. v. Stewart, 103 Mo. App. 182; Ficklin & Son v. Wabash R. Co., 115 Mo. App. 633; Gruwell v. National Council Knights, etc., of Security, 126 Mo. App. 496, 506; Green v. Cole, 127 Mo. 587.]

But defendant contends that there was no abandonment of its answer; that the answer pleads two different and distinct contracts, one the written contract with the Commissioner and another, an express *subsequent* agreement by plaintiff to secure the surrender and cancellation of the $2300 cashier's check without loss to defendant. But, under the written contract the Bank Commissioner agreed to permit plaintiff's money to be returned to him "when said bank is wholly solvent and the withdrawal thereof will not in any manner impair the capital of said bank." Having thus contracted to return the money under those conditions, how could he impose other and different conditions upon plaintiff before complying with the contract? And even if plaintiff did agree *then* to comply with the new requirement, what consideration was there for such a contract? If, under the written contract, the Commissioner's obligation to return plaintiff's money was already fixed, the promise to perform that obligation could not support the new promise by plaintiff. In such case, the new promise would be without consideration. [Lingenfelter v. Wainwright Brewery Co., 103 Mo. 578; McFarland v. Heim, 127 Mo. 327; Lindsley & Son v. Kansas City Viaduct Co., 152 Mo. App. 221.]

The reasonable and natural construction to be placed on the answer is that under the contract as pleaded the Commissioner required of the plaintiff that he take up the $2300 cashier's check; but if it could be construed as intending to plead a subsequent contract, such contract is not one that imports a consideration, and none is alleged, nor are any facts stated showing that any new consideration existed. It would seem that this should have been done. [Montgomery v. Auchley, 92 Mo. 126; Underwood

Typewriter Co. v. Century Realty Co., 220 Mo. 522, 529; Slaon v. Mitchell, 149 N. Y. Supp. 1015; Mc-Cammon v. Kaiser, 142 N. Y. Supp. 721.] And the fact that nothing of the kind was done tends very much to show that two different contracts were not pleaded and relied upon. The second was not pleaded as a substitute or modification of the first, and cannot be so regarded under the allegations in the answer. [Kalosky v. Bloch, 177 S. W. 1060, 1061.] The so-called new promise to pay the check follows as a mere repetition of the obligation necessarily flowing from the contract that had just been pleaded, and in the absence of any allegation of facts showing a consideration for the new promise, the answer should not be regarded as pleading the new in modification of the old. [Goller v. Hensler Mercantile Oil and Supply Co., 179 Mo. App. 48, 57.]

Under the *pleadings* the plaintiff was a creditor to the full extent of his deposit if the bank was solvent and payment of his deposit would not impair the capital thereof; but, under the *evidence* introduced by defendant over plaintiff's objections, the plaintiff agreed to also pay the cashier's check, notwithstanding the bank was solvent and its capital unimpaired. And, by the *instructions,* the case was submitted in such way that this additional agreement with the Commissioner could be made the sole basis of the verdict. As a matter of fact the evidence appears to be that plaintiff's agreement to pay, if any, was made with *the purchasers of his stock,* not with the Bank Commissioner. But granting that he also agreed *with the Commissioner* to pay said check without referance to solvency or impairment, and to take less than the full amount of his deposit, still such agreement as to the Commissioner was without consideration and not binding upon plaintiff, certainly in a case where the agreement with the Commissioner is relied upon as the defense.

We need not at this time go into the question of whether the Commissioner's approval of the trans-

fer of plaintiff's stock to Lobaugh and Zacharias would constitute a sufficient new consideration for plaintiff's alleged new promise. There is no evidence that there was any trouble about getting the Commissioner's approval if the purchasers chose to buy. Indeed, if the bank was solvent and unimpaired and the new men were fit to be permitted to assume charge of the bank, and they desired to buy, it was the Commissioner's public duty to grant his approval. As a public official he is in no way concerned with how advantageous a trade a purchaser may be able to make; nor can he use his official power to enable a purchaser of stock to buy at less than he otherwise would. But whether this be true or not, the fact remains that the defense was based upon a contract different from the one stated in the pleading, and the case was, over plaintiff's objections, submitted upon a theory that was outside the issues plaintiff had a right to expect would be litigated when he went to trial. Hence instruction C 1 and D 3 were erroneous. Furthermore, under instruction C 1 the jury could find that simply because plaintiff agreed with the purchasers of the stock to pay the check, he was not entitled to recover his deposit of the bank. There are other features in the instruction which rendered it erroneous. For instance, it is so worded as to require that plaintiff shall have demanded "payment of the balance of $2300." He demanded his $10,000 but there is no evidence that he made any subsequent demand for the $2300 after being paid his $7700. Having demanded the full amount, he did not have to make a separate demand for the balance; and to submit the question whether the balance was demanded was misleading. If it was proper, under any circumstances, to submit the agreement plaintiff is said to have made, the instruction should have set forth the circumstances and conditions under which such alleged agreement would justify the Commissioner

in refusing to allow plaintiff's money to be returned. To submit the issue of whether the report that plaintiff had agreed to pay the check was false, and whether the Commissioner was misled by such report, was confusing and misleading and did not give the jury any idea of what circumstances were necessary to make such agreement valid.

In the way the case was heard and submitted, the plaintiff did not obtain a fair opportunity to litigate and have decided the issues involved in the case, and it should, therefore, be reversed and remanded for a new trial.

Defendant makes the point that the contract provides that the money was to be withdrawn "with the approval of the Bank Commissioner" and that since his approval was not obtained, plaintiff has failed in his case and hence it makes no difference if there were errors in the instructions.

But this clause in the contract does not mean that the Commissioner may arbitarily or without reason withhold his consent. Nor does it mean that after making a contract specifying the terms under which the money may be withdrawn, he can, without consideration, impose new and additional terms; not even to compel plaintiff to keep an agreement he is alleged to have made with the purchasers of his stock. It may be that for a violation of plaintiff's agreement with them they may have a cause of action against him. We do not say. But, on the issues made in this case, plaintiff is entitled to a new trial.

The judgment is, therefore, reversed and the cause remanded. All concur.