Allyson BREEDING, Appellant,

v.

KYE'S INCORPORATED, Appellee.

No. 10A04–0412–CV–674.

Court of Appeals of Indiana.

July 20, 2005.

Barry N. Bitzegaio, Lorch & Naville, LLC, New Albany, for Appellant.

John R. Vissing, Vissing & Grayson, LLP, Jeffersonville, for Appellee.

## OPINION

KIRSCH, Chief Judge.

Allyson Breeding ("Breeding") appeals the trial court's grant of summary judgment in favor of Kye's Inc. ("Kye's") in Breeding's contract action seeking the return of a $750.00 deposit she made to Kye's to reserve its facility for her wedding reception. The sole restated issue is whether the trial court properly granted Kye's summary judgment motion.

We reverse and remand.

## FACTS AND PROCEDURAL HISTORY

In mid-January 2001, Breeding contacted Kye's, a special events facility in Jeffersonville, Indiana, to inquire about its availability for her June 2002 wedding reception. Sounds Unlimited Productions, LLP had an exclusive agreement with Kye's to provide disc jockey services at events held at the facility. Breeding and her parents had been family friends of the owners of Sounds Unlimited and had attended weddings where Sounds Unlimited had provided the disc jockey services— that was the reason why Breeding selected Kye's for her reception. Appellant's App. pp. 46, 48–9. Breeding visited the facility on January 30, 2001, and met with one of its representatives. Breeding and the representative discussed reception food, music, and decorations. On the information sheet filled out by the Kye's representative, entertainment was listed as "S.U.P. requests Brent and Chris." Appellant's App. at 32. "S.U.P." presumably referred to Sounds Unlimited Productions. "Brent" was Brent Rogers, and

"Chris" was Chris Hughes, the co-owners of Sounds Unlimited. Appellant's App. at 40, 83.

The following day, Breeding returned to the facility and signed a contract that provides in relevant part as follows:

Signing of this contract confirms the reservation of Kye's at Water Tower Square based upon the terms outlined herein. Signing this contract also signifies that you have read, understand and agree to comply with the written Policies and Specifications, including any Reminder Notices issued by Kye's representatives for the use of this facility . . . .

MINIMUM FACILITY FEE: $1500 is the minimum agreed fee for the use of this facility for a [four] hour period. . . . *$600 is the minimum agreed fee for disc jockey services for this event. In the services of the disc jockey exceeds the 4 hour period set out above, the client shall pay an additional fee of One Hundred Dollars ($100.00) for each hour or any fractional portion of an hour, if less than a full hour, in the same manner as the facility fee is paid.*

ADVANCE DEPOSIT: One half of the minimum agreed fee (facility *and disc jockey services,* as applicable) shall be paid at the time of booking. . . .

EVENT PAYMENT: The contract balance (facility, catering *and disc jockey services,* as applicable) shall be paid one (1) month in advance of the event. . . . *Any additional fee* for remaining on the premises beyond the agreed upon 4 hour period or *for disc jockey services shall be billed to the client when the final event invoice is issued* . . . .

CANCELLATION: All Advance Deposits identified herein are non-refundable

unless the reservation is cancelled by Kye's . . . .

**ENTERTAINMENT AND VENDORS:** Entertainment, if desired, is to be arranged by the client with the exception of disc jockey services. Sounds Unlimited Productions, LLC has an exclusive license agreement with Kye's to provide disc jockey services at all events held at Kye's where such services are requested. *The price of the disc jockey services is a part of this agreement and shall be paid for in accordance with the Event Payment provision of this contract.* All bands, single entertainers or other entertainment forms must be approved by Kye's representatives . . . .

*Appellant's App.* at 10. (Emphasis added) Pursuant to the terms of the agreement, Breeding paid the representative a $750.00 advance deposit.

In March 2002, Breeding received a letter from the owner of Kye's, Kye Hoehn ("Hoehn"). Hoehn explained that Kye's had terminated its agreement with Sounds Unlimited and that it would no longer be performing at her facility. Breeding contacted Hoehn and told her that she still wanted Sounds Unlimited to perform at her wedding reception. Hoehn explained that Sounds Unlimited was no longer allowed to provide disc jockey services at the facility.

Breeding and her mother subsequently met with Hoehn to discuss the disc jockey issue. Following the meeting, Hoehn sent Breeding's mother a letter explaining that Sounds Unlimited was not permitted to work in the facility. Hoehn further explained that Breeding could preview Kye's sound equipment and new disc jockeys at her convenience and choose any of them to perform at her reception.

Shortly thereafter, Breeding filed a complaint seeking the return of her $750.00 advance deposit. Kye's filed a summary judgment motion in July 2004, and Breeding filed the same in August 2004. The trial court granted Kye's motion, and Breeding appeals.

## DISCUSSION AND DECISION

Breeding argues that the trial court erred in granting Kye's summary judgment motion. When reviewing the grant of a summary judgment motion, we use the same standard as the trial court. *Forty-One Associates, LLC v. Bluefield Associates, L.P.*, 809 N.E.2d 422, 426 (Ind.Ct. App.2004). Summary judgment is appropriate only if the designated evidence shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Id.* We construe the designated evidence in the light most favorable to the non-moving party. *Id.* at 427. We will affirm the grant of a summary judgment motion if it is sustainable on any theory or basis found in the evidentiary material designated to the trial court. *Id.*

Construction of written contracts is generally a question of law for which summary judgment is particularly appropriate. *Id.* When the terms of the contract are clear and unambiguous, those terms are conclusive, and this court will not construe the contract or look at extrinsic evidence. *Id.* Rather, we will simply apply the contract provisions. *Id.* When interpreting a contract, a court must ascertain and effectuate the intent of the parties. *Id.* The contract must be read as a whole and the language construed so as not to render any words, phrases, or terms ineffective or meaningless. *Id.*

Here, the gravamen of Breeding's argument is that Kye's breached the contract and that Breeding is therefore entitled to a refund of her deposit. The essential elements of a breach of contract

action are the existence of a contract, the defendant's breach thereof, and damages. *Fairfield Development, Inc. v. Georgetown Woods Sr. Apartments Ltd. Partnership,* 768 N.E.2d 463 (Ind.Ct.App.2002), *trans. denied.* A party breaches a contract when it fails to perform all of the obligations that it has agreed to undertake. *Worrell v. WLT Corp.,* 653 N.E.2d 1054, 1057 (Ind. Ct.App.1995), *trans. denied.*

Breeding contends that Kye's undertook an obligation to provide her with Sounds Unlimited's disc jockey services at her reception. Kye's contends that it only undertook an obligation to provide Breeding with a facility for her reception, and reserved the right both to limit Breeding's choice of disc jockeys and approve all entertainment. We agree with Breeding.

The contract in this case is clear and unambiguous in its provisions relating to disc jockey services. The entertainment clause of the contract states that Kye's has an exclusive license agreement with Sounds Unlimited to provide disc jockey services at events held at Kye's if such services are requested. *Appellant's App.* at 10. The contract sets out the charges for the services to be provided by Sounds Unlimited and the payment arrangements for those services. *Id.* It states, *"The price of the disc jockey services is a part of this agreement* and shall be paid for in

accordance with the Event Payment provision of this contract." *Id.* In the one page contract signed by Kye's and Breeding, there are seven references to disc jockey services, and four of the seven substantive sections make reference to disc jockey services. Accordingly, we conclude that the disc jockey services which were to be provided by Sounds Unlimited at Breeding's wedding reception went to the basis of the bargain struck by Kye's and Breeding and that Kye's breached its agreement when it refused to allow Sounds Unlimited to provide those services.

We reverse the decision of the trial court and remand with instructions to vacate the summary judgment entry in favor of Kye's and to enter summary judgment in favor of Breeding.

Reversed [1]

BAKER J., concurs.

BARNES, J., dissents with separate opinion.

BARNES, Judge, dissenting.

I respectfully dissent. My colleagues apparently want to "Save the Last Dance" for Ms. Breeding. I, however, believe she received what she bargained and signed the contract for—a reception hall with a disc jockey of Kye's choice. Stuck is stuck. Although the other members of the

---

1. In his dissent, our colleague Judge Barnes borrows from the music of his youth (and ours) to illustrate his point that the contract that Breeding signed was for the rental of the hall, not the provision of disc jockey services. For reasons stated elsewhere in this opinion, we disagree. We do note, however, that Breeding, having "Heard It Through the Grapevine" that Kye's had disassociated itself from Sounds Unlimited, and doubtless suffering from the "Wedding Bell Blues" upon finding that she could "Get No Satisfaction" from Kye's, said to herself (and Kye's) "It's My Party." She decided that it would be "Kind of a Drag," if she could not have the "Mr.

Tambourine Man" of her choice as her disc jockey, and, rather than shedding "96 Tears," she would be a "Hard Headed Woman" because "Big Girls Don't Cry." It is a shame that the parties were unable to resolve their differences amicably by "Building a Bridge Over Troubled Water" so that they could "Let It Be." Alas, Breeding was left to go "Downtown" to seek another "Sugar Shack" for her wedding reception before "Leaving on a Jet Plane" for her honeymoon. (Our apologies to the younger generations who have never heard any of these songs and have no idea what we are talking about.)

panel cannot "Stand by Me," I believe that Kye's clearly and explicitly reserved the right to select the disc jockey, and Breeding was bound by the clear and unambiguous contract.

The first clause of the contract confirms the reservation of Kye's facility. The clause ends with the statement that the contract is "for the use of this facility." Appellant's App. p. 10. In addition, the minimum facility fee is $1500.00, one-half of which Breeding paid at booking pursuant to the terms of the contract. I believe that the contract is clearly and unambiguously for the use of Kye's facility.

The entertainment clause of the contract begins with the statement that "[e]ntertainment, if desired, is to be arranged by the client with the exception of disc jockey services." Appellant's App. p. 10. The provision further explains that Kye's has an exclusive license agreement with Sounds Unlimited to provide disc jockey services at events held at Kye's if such services are requested and that a Kye's representative must approve all entertainment. Contrary to Breeding's contention, this provision is not a promise from Kye's to provide its clients with a specific disc jockey. Rather, it is a provision that merely limits the client's choices for a disc jockey and other entertainment. Because Kye's had no obligation to provide Breeding with the disc jockey services of Sounds Unlimited, Kye's did not breach the contract when it offered Breeding other disc jockey choices and did not allow Sounds Unlimited to perform at Breeding's reception.

Further, to the extent that Breeding argues that she intended to contract with Kye's solely for the services of Sounds Unlimited because she and her parents had been family friends of the owners of Sounds Unlimited and had attended weddings where Sounds Unlimited had provided the disc jockey services, I would point out that the intent relevant in contract matters is not the party's subjective intent but his or her outward manifestation of it. *Real Estate Support Services, Inc. v. Nauman*, 644 N.E.2d 907, 910 (Ind.Ct.App. 1994), *trans. denied.* We do not examine the hidden intentions secreted in the heart of a person but, rather, examine the final expression found in conduct and in light of the surrounding circumstances at the time the contract was made. *Id.* at 910–11.

Here, Breeding visited Kye's on January 30, 2001, and met with one of its representatives. Breeding and the representative discussed reception food, music, and decorations. The following day, Breeding returned to the facility and signed the contract for the use of the facility. There is no designated evidence that Breeding ever told the representative that she intended to contract for the services of Sounds Unlimited. Rather, Breeding's manifested intent at the time she signed the contract was an intent to contract with Kye's for the use of its facility. I find no error and would affirm the trial court's grant of summary judgment in favor of Kye's.