## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Nov 30 2020, 9:12 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Craig R. Patterson
Matthew J. Elliott
Beckman Lawson, LLP
Fort Wayne, Indiana

ATTORNEY FOR APPELLEE
NBD INTERNATIONAL, INC.

Lindsay H. Lepley
Burt, Blee, Dixon, Sutton &
Bloom, LLP
Fort Wayne, Indiana

ATTORNEY FOR APPELLEE
SELECTIVE INSURANCE
COMPANY OF AMERICA

Jennifer Kalas
Hinshaw & Culbertson, LLP
Schererville, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Viking, Inc., <br> *Appellant-Plaintiff,* <br><br> v. <br><br> NBD International, Inc., and Selective Insurance Company of America, <br> *Appellees-Defendants.* | November 30, 2020 <br><br> Court of Appeals Case No. 20A-PL-671 <br><br> Appeal from the Whitley Superior Court <br><br> The Honorable Douglas M. Fahl, Judge <br><br> Trial Court Cause No. 92D01-1601-PL-6 |

**Mathias, Judge.**

[1]     On January 6, 2014, a fire consumed a substantial portion of the business and manufacturing premises of Viking, Inc., ("Viking"), a Columbia City, Indiana-based manufacturing business. The premises was insured by Selective Insurance Company of America ("Selective").

[2]     On January 6, 2016, Viking filed a Complaint and Demand for Jury Trial ("Complaint") in the Whitley Superior Court against Selective and NBD International, Inc. ("NBD"). NBD provides restoration and emergency services. Viking alleged that delays that occurred in the restoration of its equipment, delays that Viking attributed to NBD and Selective, caused the equipment to suffer extensive corrosion that could have been avoided had the equipment been restored immediately after the fire. Thus, Viking's Complaint alleged claims for breach of contract, negligence, and bad faith against Selective and claims for breach of contract and negligence against NBD. Selective and NBD each filed motions for summary judgment. After a hearing on February 6, 2020, the trial court granted the motions on February 26.

[3]     Viking appeals the trial court's rulings on the motions for summary judgment, raising twenty-seven issues. We consolidate and restate those issues into the following seven—whether genuine issues of material fact prelude entry of summary judgment on:

> I.     Selective's defense that a Sworn Statement in Proof of Loss executed by Viking operated as a release and as an accord

and satisfaction, barring all of Viking's claims against Selective;

II. Viking's claim against Selective for breach of the insurance contract;

III. Viking's claim against Selective for negligence;

IV. Viking's claims against Selective for negligent hiring, respondeat superior, and negligent claim handling;

V. Viking's claim that Selective breached its duty of good faith and fair dealing;

VI. Viking's claim against NBD for breach of contract; and

VII. Viking's claim against NBD for negligence.

We conclude that the trial court erred when it granted summary judgment in favor of Selective on Viking's claims of breach of the insurance contract, negligence, negligent claim handling, and the duty of good faith and fair dealing and in favor of NBD on the claims of breach of contract and negligence. But we find that the trial court properly granted summary judgment to Selective on Viking's claims of negligent hiring and respondeat superior. We thus affirm in part, reverse in part, and remand for proceedings consistent with this opinion.

## Facts and Procedural History

Viking manufactures parts for the automotive industry, including hangers and clamps. When the events leading to this appeal took place, the owners of Viking

were Steven Schwenn ("Steve") and Vickie Schwenn ("Vickie"). Viking's 80,000-square-foot Facility included an office area, manufacturing space, and storage space for inventory and raw materials.

## A. *The Fire*

On January 6, 2014, a fire occurred at the Facility. That day, there was significant snow and cold temperatures, making travel difficult. Nevertheless, firefighters were able to extinguish the fire by midday. At the time, Viking was insured by Selective under a standard commercial policy that included coverage for the building, business personal property, and business income.

The fire was centered in, and completely engulfed, the Facility's office area. The manufacturing space, which was next to the office and where Viking housed its manufacturing equipment, was not destroyed by the fire; but it was affected by the heat and smoke from the fire and the water used by the fire department to extinguish the fire. The fire left a hole in the roof that was directly over an area of the manufacturing space.

On the day of the fire, Steve contacted 1-800-BoardUp to have the building boarded up. Workers from 1-800-BoardUp came to the Facility that day and installed plywood to cover openings that were accessible from the ground. Steve also contacted his insurance broker, Jeffrey Peters. Peters contacted Selective to report the claim, then contacted Michael Kinder & Sons ("Kinder"), a commercial general contractor, and asked the contractor to come out as soon as possible to shore up the Facility to prevent further damage. However, the hole

in the Facility's roof over the manufacturing area was not fixed that day, and there was no heat in the Facility. As a result, sub-zero temperatures caused the Facility's floor to become slick and ice-covered, and Steve was "very concerned that [Viking's] machines, raw materials, and inventory were being damaged by the lack of heat[.]" Appellant's App. Vol. 17, p. 115. Steve entered the Facility the next day and saw that "everything was rusting." Appellant's App. Vol. 20, p. 38.

[9] Two days after the fire, Cheryl Sutton, a claim adjuster with Selective, traveled to the Facility to perform an assessment. During a phone conversation between Sutton and Steve, Sutton "indicated that Selective would be taking care of everything and [Viking] didn't have anything to worry about[;] she would get this assigned to a large loss agent[, as she did not handle claims for large losses,] and they would be in contact with [Viking]." Appellant's App. Vol. 6, p. 133.

[10] Around the time that Sutton spoke with Steve, Selective sent a letter addressed to Viking. The letter, dated January 6, acknowledged Selective's receipt of Viking's claim for fire loss, specifically:

> We are in receipt of your claim reported to us on 01/06/2014.
>
> If you have already been contacted regarding this claim, there is nothing more for you to do at this time. Your claim will begin to be worked on and you will be contacted if there is any further information.
>
> If you have not yet been contacted regarding this claim, please call the number listed below . . . so we can continue our handling

of your claim. If your claim has already been settled there is no need to contact us regarding this matter.

Appellant's App. Vol. 7, p. 49. The letter included Sutton's contact information. Around January 9, Selective issued advance payment to Viking in the amount of $25,000.00 for payroll and other business interruption expenses.

[11] Between January 13 and 24, several key events occurred regarding the fire loss. Mark Vandegraft ("Vandegraft"), an adjuster from Selective's Large Loss Unit, met with Steve and Vickie. On January 14, Vandegraft inspected the Facility as to the fire loss. Around the same time, Selective sent another letter addressed to Viking that, except for the date, was nearly identical to the January 6 letter. The second letter was dated January 14. Also on January 14, Kinder met with Steve, Vickie, and Vandegraft. During the meeting, they discussed building a temporary wall to cover the hole created by the fire as well as plans for a temporary office. On January 16, ten days after the fire occurred, MK & Sons constructed a temporary wall to seal the "gaping hole" in the roof and protect the Facility from snow that was being blown inside. Appellant's App. Vol. 6, p. 168.

### B. NBD's Arrival at the Facility

[12] NBD performs fire, water, and mold restoration and emergency services nationwide for commercial customers, with an emphasis in equipment repair, restoration, and disaster response. NBD was contacted by Selective on January 14, regarding performing a technical assessment of the Facility's equipment. A

technical assessment consists of visiting a loss site, determining whether power is available to the equipment, and examining the extent of damage to the equipment. The process involves taking photographs of the damage to assess the conditions that existed before, during, and after the assessment, as well as recording the make, model, and serial numbers of the equipment, if available. The purpose of the technical assessment is to evaluate the loss in order to provide the insurance company—in this case, Selective—with an idea of the condition of the equipment; whether the equipment can be cleaned or restored; and the costs associated with the cleaning or restoration.

[13] In addition to being asked by Selective to complete the technical assessment for Viking's equipment, NBD was "tasked to get three priority machines up and running." Appellant's App. Vol. 17, p. 188. The parties dispute whether Selective or Viking asked for the repair of the machines.

[14] Ron Smith ("Smith"), NBD's project manager, arrived at the Facility on January 16. When he arrived, electricity and heat still had not been restored to the Facility. On January 16 and 17, Ron and another NBD employee performed the technical assessment.

[15] At some point, mostly likely either January 16 or 17, NBD was hired to begin the mitigation, cleaning, and repair of Viking's equipment. The parties dispute the date on which NBD was hired and whether NBD was hired by Selective or by Viking. Nevertheless, Steve signed a Work Authorization to Proceed ("Work Authorization") that was provided to him by NBD and which, according to

Steve, was blank when he signed it. Steve testified in his deposition that Ron informed him that he needed to sign the Work Authorization before NBD would enter the Facility.

[16] Once Steve signed the Work Authorization, Smith told him that the work crew from NBD would arrive at the Facility on January 17 or 18. Steve then provided a list, in order of priority, of seven machines that he wanted repaired.

[17] On January 18, NBD's work crew arrived and began the mitigation and cleaning of the equipment, which continued through the following day.[1] While performing the mitigation, NBD also worked on the priority-listed machines that Steve had provided. However, during the cleaning process of the machines, an incident occurred where either a Viking employee or a member of the NBD crew sprayed WD-40 on one of the machines, causing it to jam. That particular machine had to be disassembled and cleaned, and the brass bearings had to be machine-turned, shimmed, and replaced because the application of WD-40 to brass removes any lubrication present. By January 20, fully two weeks after the fire, heat still had not been restored to the Facility.

## C. Viking Hires a Public Adjuster

[18] On January 20, Viking hired a public adjuster, William "Bill" Watterud ("Watterud") to assist Viking in the settlement of its insurance claim. That same

---

[1] Mitigation involved removing heavy soot build up from the equipment and applying lubricant to certain metal parts to prevent further damage until the work crew can later return and begin the cleaning process. After mitigation, the crew disassembles the equipment and begins the cleaning process.

day, Watterud did a walk-through of the building with Smith, and Smith provided an update on the mitigation, cleaning, and repair work being performed by NBD. Watterud told NBD to stop performing the work. Upon receiving the directive, the crew stopped working. But NBD remained at the Facility to finish the technical assessment and to perform an inventory of the parts located at the Facility. The inventory was performed on January 21 and 22.

[19] A day later, on January 21, Watterud asked Smith to have his crew resume working on Viking's machines—this time performing mitigation only and no cleaning. Watterud asked Smith to write the words "mitigation only" on the Work Authorization. Appellant's App. Vol. 17, p. 171. By this time, limited heat and some lighting—provided by temporary electricity—was being supplied to the Facility.

[20] On January 23, NBD resumed mitigation work on the machines. However, the following day, either Watterud or Steve instructed NBD to stop working, and the mitigation work was again halted. NBD did not return to the Facility to perform any work after January 24, with the exception of retrieving its equipment. As of that date, NBD had completed the inventory and the technical assessment.

The same day NBD stopped working, Viking hired another restoration company, Protechs, Inc. ("Protechs"),[2] to complete the cleaning and restoration work at the Facility. Protechs worked at the Facility from January 27, 2014, through February 12, 2015.

### D. Selective Hires Equipment-Expert Ian Malee

On February 26, over a month after NBD left Viking's facility, Vandegraft contacted Ian Malee, an equipment expert, and asked Malee to visit the Facility to perform a site inspection and evaluate the condition of Viking's equipment. Malee visited the Facility for the first time sometime between February 26 and March 7. On March 7, Malee sent Vandegraft a preliminary report that contained his findings regarding Viking's equipment. The report indicated that Viking was experiencing equipment failures that would not have occurred had the equipment been subjected to a thorough recovery protocol.

### E. NBD's Invoice

Meanwhile, on January 30, NBD emailed Vandegraft and attached an invoice in the amount of $63,357.56 for the work NBD performed at the Facility. Vandegraft testified that he first saw the invoice on March 5, 2014. NBD did not send the invoice to Viking. Vandegraft initially attempted to dispute the

---

[2] Protechs is not a party to this appeal.

invoice based on Watterud's and Steve's complaints regarding the quality of NBD's work.

[24] On April 21, NBD filed a lawsuit against Viking, seeking to collect the invoice amount. After NBD filed suit, Vandegraft paid the amount in full. Selective decided to pay the NBD invoice in exchange for NBD dismissing the lawsuit. Selective assessed the $63,357.56 payment to NBD against the limits of Viking's insurance policy. Specifically, Selective allocated $2,000.00 of the payment to Viking's building coverage and the remaining $61,357.56 to Viking's business personal property coverage. Viking and Selective dispute whether Viking knew that Selective assessed the payment against the limits of the policy.

## F. The Processing of Viking's Insurance Claim

[25] Over the next year and a half, Selective (through Vandegraft) and Viking (through Watterud) negotiated Viking's claim. Over the course of the negotiations, Vandegraft and Watterud exchanged spreadsheets that detailed payments to vendors and indicated the coverage limits to which each payment would apply.

[26] In August 2015, near the end of the negotiations, Watterud advised Vandegraft that Viking was "contemplating submitting a second claim of damages because [Viking was] running into the limits on [its] business personal property" coverage. Appellant's App. Vol. 6, p. 67. Specifically, Viking and Watterud "contemplated how c[ould] we recover [for damages allegedly attributable] to the fact that NBD or Selective didn't start sooner to minimize the damage[.]"

*Id.* Viking's proposal for submitting a second claim was memorialized in an August 4 letter that Watterud sent to Selective. The letter informed Selective that Viking intended to present "a second claim for the work and services not properly performed by [NBD] which would have minimized damages." *Id.* at 92.

On September 16, Vandegraft emailed Watterud and attached a draft letter in response to the August 4 letter. The September 16 letter explained that a claim for work improperly performed by NBD would not be covered under the insurance policy due to the policy's exclusion for faulty, inadequate, or defective workmanship or repairs. The letter concluded:

> The above policy language would mean that any additional cost of repair or replacement that was required as a result of the inadequate workmanship, repair or renovation by [NBD] would not be covered. It would be our recommendation that these concerns be taken directly to [NBD].

Appellant's App. Vol. 13, p. 3.

Watterud replied by email the following day, indicating that he thought inadequate work by NBD would be covered under the policy and that Vandegraft's letter should include language to this effect. Vandegraft then provided a revised letter dated September 17, that concluded:

> The above policy language would mean that any additional cost of repair or replacement that was required as a result of the inadequate workmanship, repair or renovation by [NBD] would not be covered. *In that the facts speak for themselves and the*

*restoration estimate and efforts from NBD were neither accurate nor up to industry standard*, it would be our recommendation that these concerns be taken directly to [NBD].

Appellant's App. Vol. 8, p. 12 (emphasis added).

[29] A few hours after receiving the September 17 letter, Watterud forwarded to Viking a September 16 email that he had received from Vandegraft. The email contained proposed final settlement figures, including a credit back to Selective of $49,182.77 for an earlier overpayment of Viking's business income coverage claim. Watterud advised Viking, "Guys see below for final. I think [it's] fair and as much as we are going to suck out of them[.]" Appellant's App. Vol. 6, p. 106. Although Viking had contemplated submitting a second claim for "damage due to the fact that NBD or Selective didn't start sooner to minimize the damage," it did not submit a second claim. *Id.* at 67.

[30] On October 1, Vandegraft emailed Watterud a proposed Sworn Statement in Proof of Loss ("Sworn Proof of Loss") that listed amounts Selective had paid to Viking "to date[,]" as well as a final payment that Selective owed to Viking in the amount of $93,673.91. Appellant's App. Vol. 13, p. 29. The Sworn Proof of Loss reads in relevant part:

A fire loss occurred . . . on the 6th day of January, 2014 . . . .

* * *

The Whole Loss and Damage was . . . $4,691,822.89

Less Amount of Deductible . . . $(1,000.00)

The Amount Claimed under the above numbered policy is . . .
$4,690,822.89

*Id.* at 31.[3]

[31] On October 15, Steve signed the "Receipt for Payment" section of the Sworn Proof of Loss on behalf of Viking, acknowledging that Viking had received $4,690,822.89 from Selective "in full satisfaction and indemnity for all claims and demands upon [Selective] on account of said loss and damage and the said policy is hereby reinstated[.]" Appellant's App. Vol. 6, p. 91.

[32] On January 6, 2016, Viking filed its Complaint against NBD and Selective. Viking sought recovery from Selective based on theories that Selective: (1) breached the insurance contract; (2) negligently performed a voluntary undertaking to mitigate damages to Viking's equipment following the fire; (3) negligently hired NBD to perform mitigation work; and (4) violated its duty of good faith and fair dealing in its handling of the insurance claim. Viking asserted causes of action against NBD for: (1) breach of contract; and (2) negligence that, allegedly, arose from the cleaning and restoration work that NBD performed on Viking's equipment.

---

[3] The $4,690,822.89 figure listed on the Sworn Proof of Loss includes the $93,673.91 final payment that Selective owed to Viking.

In December 2019, Selective and NBD each filed motions for summary judgment. Viking filed its briefs in opposition to the motions on January 29, 2020. On February 6, the parties appeared for a hearing on the summary judgment motions. And on February 26, the trial court entered two separate orders granting summary judgment in favor of Selective and NBD on all respective arguments raised.[4]

Viking now appeals. Additional facts will be provided as necessary.

# Discussion and Decision

## I. Standard of Review

Our standard of review of a summary judgment motion is the same standard used in the trial court:

> [S]ummary judgment is appropriate only where the evidence shows there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. All facts and reasonable inferences drawn from those facts are construed in favor of the non-moving party. The review of a summary judgment motion is limited to those materials designated to the trial court. We must carefully review decisions on summary judgment motions to ensure that the parties were not improperly denied their day in court.

---

[4] For Selective, this included granting summary judgment based on theories of accord and satisfaction, release, the economic loss doctrine, causation, assumption of duty, breach of contract, negligence, negligent hiring, and bad faith. For NBD, it included granting summary judgment based on causation and the economic loss doctrine.

*Tom-Wat, Inc. v. Fink*, 741 N.E.2d 343, 346 (Ind. 2001) (citations omitted).

[36] "The purpose of summary judgment is to terminate litigation about which there can be no material factual dispute and which can be resolved as a matter of law." *Ebersol v. Mishler*, 775 N.E.2d 373, 378 (Ind. Ct. App. 2002), *trans. denied.* Therefore, "[a] party seeking summary judgment bears the burden of showing the absence of a factual issue and [its] entitlement to judgment as a matter of law." *Harco, Inc. of Indianapolis v. Plainfield Interstate Fam. Dining Assoc.*, 758 N.E.2d 931, 937 (Ind. Ct. App. 2001). All pleadings, affidavits, and testimony are construed liberally and in the light most favorable to the nonmoving party. *Baker v. Heye-Am.*, 799 N.E.2d 1135, 1139 (Ind. Ct. App. 2003), *trans. denied.* For summary judgment purposes,

> [a] genuine issue of material fact exists where facts concerning an issue that would dispose of the litigation are in dispute or where the undisputed material facts are capable of supporting conflicting inferences on such an issue. To be considered genuine . . . , a material issue of fact must be established by sufficient evidence in support of the claimed factual dispute to require a jury or judge to resolve the parties' differing versions of the truth at trial. A fact is material when its existence facilitates resolution of any of the issues involved.

*Id.* (citations omitted). "[A]ny doubt as to the existence of an issue of material fact, or an inference to be drawn from the facts, must be resolved in favor of the nonmoving party." *Am. Mgmt., Inc. v. MIF Realty, L.P.*, 666 N.E.2d 424, 428 (Ind. Ct. App. 1996).

"Even if it appears that the non-moving party will not succeed at trial, summary judgment is inappropriate where material facts conflict or undisputed facts lead to conflicting inferences." *Link v. Breen*, 649 N.E.2d 126, 128 (Ind. Ct. App. 1995), *trans. denied*; *see also Brunner v. Trs. of Purdue Univ.*, 702 N.E.2d 759, 760 (Ind. Ct. App. 1998) ("Summary judgment should not be used as an abbreviated trial."), *trans. denied*. Finally, "[o]ur analysis proceeds from the premise that summary judgment is a lethal weapon and courts must be ever mindful of its aims and targets and beware of overkill in its use." *Bunch v. Tiwari*, 711 N.E.2d 844, 847 (Ind. Ct. App. 1999).

We observe that, in the present case, the trial court made findings and conclusions in support of its entries of summary judgment. Special findings are not required in summary judgment proceedings and are not binding on appeal. *AutoXchange.com. Inc. v. Dreyer & Reinbold, Inc.*, 816 N.E.2d 40, 48 (Ind. Ct. App. 2004). However, such findings offer this court valuable insight into the trial court's rationale for its review and facilitate appellate review. *Id.*

## II. Viking's Claims Against Selective

Viking argues that the trial court erred when it granted summary judgment in favor of Selective. More specifically, Viking contends that genuine issues of material fact exist as to whether Selective: breached its insurance contract with Viking; was negligent in dealing with Viking; negligently hired NBD; was negligent in handling Viking's claim; and violated its duty to deal with Viking in good faith and fair dealing. Selective counters that the trial court properly found no genuine issues of material fact and, thus, did not err in concluding

that summary judgment should be granted in favor of Selective on all of the argument's Selective raised in its motions for summary judgment—those arguments being that: Viking's claims are barred due to its execution of the Sworn Proof of Loss; Viking's breach of contract and negligence claims fail on the element of causation, for failure to identify how the contract was breached, on the theory of assumption of duty, and on the doctrine of economic loss; and Selective's designated evidence affirmatively showed that it acted in good faith. We address each argument in turn.

### A. Genuine Issues of Material Fact Exist as to Whether Viking's Claims Are Barred by Its Execution of the Sworn Proof of Loss

Viking argues that there are disputed issues of fact regarding whether execution of the Sworn Proof of Loss barred its claims against Selective such that summary judgment in Selective's favor was inappropriate. On October 15, 2015, Steve, on behalf of Viking, signed the "Receipt for Payment" section of the Sworn Proof of Loss, confirming that Viking had received from Selective $4,690,822.89 "in full satisfaction and *indemnity* for *all claims and demands* upon [Selective] on account of *said* loss and damage and the said policy is hereby reinstated[.]" Appellant's App. Vol. 6, p. 91 (emphasis added). In its order granting summary judgment in favor of Selective, the trial court found,

> Nowhere does [the Receipt for Payment section of the Sworn Proof of Loss] state that it is limited to claims for insurance coverage, nor does it exclude claims sounding in tort, as Viking urges the Court to construe it. Instead, it clearly and unambiguously states that it applies to "all claims and demands" upon Selective that are "on account of" the "loss and damage"

from a fire on January 6, 2014. Viking's tort claims are "on account of" such loss and damage, as they exist only because of the fire.

Appellant's App. Vol. 2, p. 113. The trial court concluded that the Sworn Proof of Loss was both a release and an accord and satisfaction that barred all of Viking's claims "whether sounding in contract or in tort[.]" *Id.*

### 1. Release

[41] Viking disputes the trial court's conclusion that the Sworn Proof of Loss operated as a release of all of its claims resulting from the fire, citing three reasons. First, Viking argues that the Sworn Proof of Loss should not have been construed as a release because the word "release" is used in the notary section of the document but not in the "Receipt for Payment" section. According to Viking, "[i]f Selective wanted the Receipt for Payment to constitute a release of all claims, it should have used" different wording in that section. Appellant's Br. at 40. Specifically, Selective "should have used the word 'release' instead of 'indemnity' and the word 'all' instead of 'said.'" *Id.* Second, Viking argues that there is a genuine issue of material fact as to whether by executing the Sworn Proof of Loss it intended to release all of its claims against Selective. Viking maintains that it designated evidence indicating that it did not believe it was releasing all of its claims against Selective when it signed the Sworn Proof of Loss. Third, Viking argues that it received no consideration in exchange for a release of its claims. According to Viking, the payment it received from Selective "cannot be consideration for Viking's alleged agreement to release all

claims" because the payment was no more than what the insurance policy required and in an amount to which Selective had agreed prior to sending Viking the Sworn Proof of Loss. *Id.* at 41.

[42] Releases are contracts and, as with any contract, should be interpreted according to the standard rules of contract law. *Huffman v. Monroe Cnty. Cmty. Sch. Corp.*, 588 N.E.2d 1264, 1267 (Ind. 1992). "[R]elease documents shall be interpreted in the same manner as any other contract document, with the intention of the parties regarding the purpose of the document governing." *Id. at 1267*.

> In general, if the language of a contract is unambiguous, the intent of the parties is determined from the four corners of the document. However, when the language in a contract is ambiguous or uncertain, its meaning is to be determined by the consideration of extrinsic evidence. A contract is ambiguous only where a reasonable person could find its terms susceptible to more than one interpretation.

*Cummins v. McIntosh*, 845 N.E.2d 1097, 1104 (Ind. Ct. App. 2006) (internal citations omitted), *trans. denied*.

[43] "A valid contract requires offer, acceptance, consideration, and manifestation of mutual assent." *Fam. Video Movie Club, Inc. v. Home Folks, Inc.*, 827 N.E.2d 582, 585 (Ind. Ct. App. 2005). Consideration is defined as "[s]omething of value (such as an act, a forbearance, or a return promise) received by a promisor from a promise[e]." *Jackson v. Luellen Farms*, 877 N.E.2d 848, 857 (Ind. Ct. App. 2007) (citing Black's Law Dictionary 300 (7th ed. 1999)). It is well-settled that a

release, in order to be valid, must be supported by consideration. *Bogigian v. Bogigian,* 551 N.E.2d 1149, 1151 (Ind. Ct. App. 1990). "[I]t is fundamental that a contract is unenforceable if it fails to obligate the parties to do anything[.]" *Licocci v. Cardinal Assocs., Inc.*, 445 N.E.2d 556, 559 (Ind. 1983). Long ago, our supreme court established that a promise to do what one "is already bound to do by law or by contract" is insufficient consideration. *Ritenour v. Mathews*, 42 Ind. 7, 14 (1873).

[44]  Here, we cannot say that the language of the Sworn Proof of Loss is "clear and unambiguous" on its face. The document is entitled "Sworn Statement In Proof Of Loss." The word "release" does not appear in the document, save for the notary section. The document indicates that: a "fire loss" occurred on January 6, 2014; the "Whole Loss and Damage" amount was $4,690,822.89 (after subtraction of the $1,000.00 deductible); and, in the Receipt for Payment section, Selective's payment to Viking totaling $4,690,822.89 was "in full satisfaction and indemnity for all claims and demands" against Selective "on account of" the fire. Appellant's App. Vol. 6, p. 91. However, it is unclear whether execution of the document was intended to prevent Viking from filing an action against Selective to recover for damage to Viking's equipment that, according to Viking, was not caused by the fire, but instead was allegedly caused by Selective's delay in the restoration of the equipment.

[45]  Regarding consideration, at the time Steve executed the Sworn Proof of Loss, Selective had already paid $4,358,148.98 either directly to Viking or on behalf of Viking in connection with the January 6 fire. The amount was paid in

twenty-one separate payments within the first nine-and-one-half months following the fire. Viking received from Selective the final outstanding payment of $93,673.91 after Viking executed the Sworn Proof of Loss. However, it is unclear whether the Sworn Proof of Loss was the product of a bargained-for exchange between the parties or whether by paying the outstanding amount, Selective was doing no more than what it was legally and contractually obligated to do.

[46]     We therefore conclude that genuine issues of material fact exist regarding the intent behind the Sworn Proof of Loss, whether it was supported by sufficient consideration, and whether it constitutes a release that bars all of Viking's claims against Selective. Thus, the trial court's grant of summary judgment in favor of Selective on the issue of release was improper.

## 2. *Accord and Satisfaction*

[47]     Next, Viking argues that the trial court erred by concluding that the Sworn Proof of Loss operated as an accord and satisfaction that barred all of Viking's claims against Selective. According to Viking, genuine issues of material fact exist as to whether the Sworn Proof of Loss operated as an accord and satisfaction for three reasons: (1) Selective indicated that it would not entertain a second claim from Viking; (2) Selective received a credit of $49,182.77 for an earlier overpayment of Viking's business income coverage claim; and (3) Selective paid Viking only what the insurance policy required it to pay. Selective maintains that the requisite criteria for summary judgment are present because the Receipt for Payment section of the Sworn Proof of Loss "made

unambiguously clear that the final payment [from Selective to Viking] was tendered in full satisfaction for all claims and demands." Br. of Appellee Selective at 28.

[48] "An accord and satisfaction is a contract between the parties in performance of terms other than those terms originally agreed upon and in satisfaction of the parties' original obligations." *Fifth Third Bank of Se. Ind. v. Bentonville Farm Supply, Inc.*, 629 N.E.2d 1246, 1249 (Ind. Ct. App. 1994), *trans. denied*. The term "accord" means "an express contract between two parties by means of which the parties agree to settle some dispute on terms other than those originally contemplated, and the term 'satisfaction' denotes performance of the contract." *Mominee v. King*, 629 N.E.2d 1280, 1282 (Ind. Ct. App. 1994) (citation omitted). Accord and satisfaction generally refers to the acceptance of a check that is tendered and accepted as payment in full of a disputed claim. *Id.* at 1282–83 (citing 1 Am. Jur. 2d *Accord and Satisfaction* § 21, at 320). For accord and satisfaction to apply, the claim must be the subject of a good-faith dispute, rather than a liquidated and fixed claim. *Gearhart v. Baker*, 393 N.E.2d 258, 260 (Ind. Ct. App. 1979). The question of accord and satisfaction is normally a question of fact and becomes one of law only if the requisite controlling facts are undisputed and clear. *Tabani v. Hester*, 174 Ind. App. 56, 58, 366 N.E.2d 193, 194 (1977).

[49] In order to operate as a full discharge of a debt, the money paid in accord and satisfaction must be offered with either an express condition that acceptance is in full satisfaction of the pending claim, or the circumstances must be such as to

clearly indicate to the creditor that the condition is present. *Id.* at 194. Without an express condition being shown in the instrument, "an accord and satisfaction may be implied, but only upon a showing of the subjective intent of the party to be bound." *Id.* at 195. If the intent of the parties is in dispute or is ambiguous, the question is to be presented to the trier of fact for determination. *Id.*

[50] The designated evidence, viewed in the light most favorable to Viking, is sufficient to defeat Selective's motion for summary judgment on this issue. For example, there is conflicting evidence as to whether Viking believed that Selective's payment was offered in full satisfaction of a disputed claim such that any additional claims by Viking against Selective were barred. The Receipt for Payment section of the Sworn Proof of Loss is ambiguous and does not conclusively exclude an action on the part of Viking to recover for damage to Viking's equipment that, according to Viking, was not caused by the fire, but instead was allegedly caused by Selective's delay in the restoration of the equipment. And genuine issues of material fact exist as to whether the Sworn Proof of Loss is supported by sufficient consideration. All of this evidence is capable of supporting the inference that the Sworn Proof of Loss was not intended to operate as an accord and satisfaction. Thus, the trial court erred in granting summary judgment in favor of Selective on this issue.

### B. Genuine Issues of Material Fact Preclude Entry of Summary Judgment on Viking's Claim Against Selective for Breach of the Insurance Contract

[51] Next, Viking argues that the trial court erred in granting Selective summary judgment on Viking's claim of breach of the insurance contract. The elements

of a breach of contract claim are the existence of a contract, the defendant's breach, and damages to the plaintiff. *Fowler v. Campbell*, 612 N.E.2d 596, 600 (Ind. Ct. App. 1993). In addition, the alleged breach by the defendant must be a cause in fact of the plaintiff's loss. *Id.* at 601.

[52] Here, Viking's argument is twofold: (1) whether Selective breached the insurance contract; and (2) whether Selective caused Viking's damages. We address each in turn.

### 1. Breach of Contract

[53] Viking's first argument, that Selective breached the insurance contract (the insurance policy), is centered on the contractual obligations mandated by the policy between it and Selective. A contract is "an agreement between two or more parties creating obligations that are enforceable or otherwise recognizable at law." Black's Law Dictionary (11th ed. 2019). A party breaches a contract when it fails to perform all of the obligations that it has agreed to undertake. *Breeding v. Kye's Inc.*, 831 N.E.2d 188, 191 (Ind. Ct. App. 2005).

[54] Viking makes the following four contentions to support its argument that Selective breached the insurance policy: (1) Selective unilaterally closed its claim for business interruption coverage and failed to pay Viking more under the business interruption coverage for lost customer business; (2) Selective forced "Viking to sign a global release of all claims to receive payment under the [p]olicy"; (3) Selective failed to tender to Viking more than just the one proof of loss where, according to Viking, the policy required Selective to tender

multiple proofs of loss; and (4) Selective "wrongfully denied" the "second claim" that Viking "submitted" to Selective "for the poor work performed by NBD." Appellant's Br. at 50–51. Selective counters that Viking's breach of contract claim fails for two reasons: (1) Viking has failed to identify any provision of the insurance policy that Selective allegedly breached; and (2) Viking's claim sounds in tort, not contract.[5]

[55]	The trial court determined that summary judgment in favor of Selective was appropriate because the court found, essentially, that Selective had met its contractual obligations and that Viking designated no evidence showing that Selective had failed to do so. We conclude, however, that the judgment of the trial court on this issue must be reversed.

[56]	While Viking does not point to a particular provision of the insurance policy that Selective allegedly breached, we nevertheless conclude that genuine issues of material fact exist as to whether Selective met its contractual obligations under the policy. For example, genuine issues of material fact exist as to

---

[5] Additionally, Selective asserts that of the four theories Viking offers on appeal in support of its breach of the insurance contract argument, the only theory raised in the trial court was the one concerning the business interruption coverage. While the other three theories were not specifically argued at the trial court level under Viking's breach of the insurance contract heading in its brief in opposition to Selective's summary judgment motions, as Viking notes in its reply brief, "all of these facts were designated by Viking and known to Selective and the trial court . . . [because t]hese facts and their legal implications have been litigated throughout the case." Appellant's Reply Br. at 23. Therefore, we address Viking's arguments on the merits. Regarding Selective's argument that Viking's breach of contract claim is based in tort, not contract, we find that this argument is more appropriately addressed *infra*, in Part II-C-2, where we determine whether summary judgment in favor of Selective was proper on Viking's claim for negligence.

whether Selective refused to comply with the policy conditions until first obtaining a release of claims from Viking. Factual disputes exist as to whether the payments made to Viking (or on Viking's behalf) were timely, paid to the limits of the policy, and covered all of the losses Viking claimed. And further, it is not clear under the policy whether the Sworn Proof of Loss that Viking executed was intended to serve as a release of Viking's claims against Selective and whether Selective improperly denied Viking's second claim. Accordingly, we conclude that the trial court erred by granting Selective's summary judgment motion on this issue of breach of the insurance contract.

### 2. Causation Evidence

[57] We now turn to Viking's second argument on its breach of the insurance contract claim, that is, whether Selective was the proximate cause of Viking's damages and whether the trial court erred when it granted summary judgment on this question. As noted *supra*, the elements for this claim are the existence of a contract, the defendant's breach of the contract, and the plaintiff's damages as a result of the breach. *Fowler*, 612 N.E.2d at 600.

[58] Summary judgment is a "high bar" for the moving party to clear in Indiana. *Hughley v. State*, 15 N.E.3d 1000, 1004 (Ind. 2014). Unlike federal practice, which "permits the moving party to merely show that the party carrying the burden of proof [at trial] lacks evidence on a necessary element, we impose a more onerous burden: to affirmatively 'negate an opponent's claim.'" *Id.* at 1003 (quoting *Jarboe v. Landmark Cmty. Newspapers of Ind., Inc.*, 644 N.E.2d 118, 123 (Ind. 1994)). Thus, for summary judgment to be

appropriate, the movant must have made a prima facie showing that its designated evidence negated an element of the nonmovant's claim, and, in response, the nonmovant must have failed to designate evidence to establish a genuine issue of material fact. *See Dreaded, Inc. v. St. Paul Guardian Ins. Co.*, 904 N.E.2d 1267, 1270 (Ind. 2009).

[59] The trial court, in its order granting summary judgment in favor of Selective on this issue, found in relevant part that Viking failed to meet its burden "to establish each element of its claims, particularly causation and damages[.]" Appellant's App. Vol. 2, p. 128. Viking argues that the trial court improperly shifted onto it the burden of producing evidence that its damages were caused by Selective. We agree. Viking as the nonmovant plaintiff bore no burden of production until Selective, as the movant, came forward with evidence establishing the absence of any issue of material fact as to the cause of Viking's damages. *See Butler v. City of Peru*, 733 N.E.2d 912, 915 (Ind. 2000). We now address whether Selective met its burden.

[60] Selective contends that it has successfully negated the element of causation such that Viking cannot prevail on its breach of contract claim as a matter of law. With its motion for summary judgment, Selective designated a report containing the opinions of its expert Larry Hanke ("Hanke"), a metallurgical materials engineer. Hanke opined that: any delay in mitigation efforts did not cause additional damage to Viking's equipment; any damage due to the expansion of freezing water was not caused by delay; minimal or no corrosion occurred during the weeks following the fire; establishing climate control

sooner would not have significantly limited corrosion; and, given the lack of retained evidence and inadequate documentation regarding the physical condition of Viking's equipment prior to and during the restoration process, it is impossible to determine if the damage to the equipment was caused by the fire or if any additional damage to the equipment was caused by the mitigation efforts and the restoration schedule.

[61] Viking, on the other hand, designated evidence that all of its machines were located outside of the area where the fire occurred. Viking also included the two letters that Selective sent shortly after the fire occurred, stating that "there is nothing more for [Viking] to do at this time. Your claim will begin to be worked on and you will be contacted if there is any further information." Appellant's App. Vol. 7, p. 49. Viking contends that Vandegraft retained NBD to assess, clean, and repair Viking's equipment and that Vandegraft insisted that NBD perform the restoration work on Viking's claim. Viking presented evidence that: its equipment suffered additional damage after the fire due to the environment that persisted after the fire; after the fire was extinguished, the Facility had no heat and very high humidity from the water used to fight the fire; there was smoke residue and soot on the equipment; and even after NBD began working at the Facility, Selective did nothing to address the environment inside the Facility. In addition, Viking designated the testimony of Gregory Smith, the owner of Protechs, who opined, "there could have been things done between [the date the fire occurred and January 27, 2014,] to help mitigate [the] loss and could have saved [Viking] money." Appellant's Br. at 26. Greg based these

observations on his inspection of the Facility, his professional experience, and industry articles.

[62] Viking also designated the testimony of its "restoration expert" David Oakes ("Oakes"). *Id.* at 27. In his opinion, certain steps should have been taken immediately after the fire to mitigate the Facility's environment and preserve its contents, including: boarding up, restoring heat to, and addressing the humidity level of the Facility; removing residue and applying oil to the equipment; and using experts as necessary to disassemble and repair the equipment. Oakes believed that the failure to timely implement these procedures exposed the equipment to an acidic and toxic residue that resulted in substantial corrosion damage and caused Viking to incur "an additional 90[%]" in repair expenses. Appellant's App. Vol. 14, p. 29. He also believed that the damage was directly attributable to the delays in addressing the problems and not to the initial fire loss.

[63] Here, based on the competing "expert" testimony presented, we find that Selective has not met its burden of negating the element of causation as a matter of law. Therefore, we conclude that the trial court improperly granted summary judgment to Selective on this issue.

### C. Genuine Issues of Material Fact Preclude Entry of Summary Judgment on Viking's Claim Against Selective for Negligence

[64] Next, Viking argues that the trial court erred in granting summary to Selective on Viking's claim against Selective for negligence. Negligence is composed of three elements: (1) a duty on the part of a defendant in relation to the plaintiff;

(2) a breach of this duty, i.e., a failure on the part of the defendant to conform his conduct to the requisite standard of care required by the relationship; and (3) an injury to the plaintiff that was proximately caused by the defendant's breach. *Stumpf v. Hagerman Const. Corp.*, 863 N.E.2d 871, 875–76 (Ind. Ct. App. 2007) (citing *Merrill v. Knauf Fiber Glass GmbH*, 771 N.E.2d 1258, 1264 (Ind. Ct. App. 2002), *trans. denied*), *trans. denied*. Although we often say that summary judgment is rarely appropriate in a negligence action, a defendant may obtain summary judgment by demonstrating that the undisputed facts negate at least one element of the plaintiff's claim. *Id.* at 876 (citing *Merrill*, 771 N.E.2d at 1264).

[65] Here, the parties argue over (1) whether Selective voluntarily assumed a duty to mitigate Viking's damages following the fire loss, and (2) whether Viking's claim is barred by the economic loss doctrine. We first address Viking's assumption of duty argument.

### 1. Assumption of Duty by Conduct

[66] Viking argues that Selective, by its conduct, assumed a duty to mitigate Viking's loss. "A duty to exercise care and skill may be imposed on one who, by affirmative conduct, assumes to act, even gratuitously, for another." *Schlotman v. Taza Cafe*, 868 N.E.2d 518, 523 (Ind. Ct. App. 2007), *trans. denied; see also Merrill*, 771 N.E.2d at 1270 ("A duty of care may arise where a party gratuitously or voluntarily assumes a duty by conduct."). The actor must specifically undertake to perform the task he is charged with having performed negligently; without actual assumption of the undertaking, there can be no

corresponding legal duty to perform the undertaking carefully. *Schlotman,* 868 N.E.2d at 523. Thus, the assumption of a duty creates a special relationship between the parties and a corresponding duty to act in a reasonably prudent manner. *Id.*; *Merrill,* 771 N.E.2d at 1270. Although the existence and extent of an assumed duty are ordinarily questions for the trier of fact, a court will decide the issue as a matter of law when the record contains insufficient evidence to establish such a duty. *Merrill,* 771 N.E.2d at 1270

[67] The trial court here rejected the argument that Selective had assumed a duty to mitigate Viking's loss, finding in relevant part as follows:

> Viking points to the language of the January 6, 2014 letter, as well as statements allegedly made by Selective's claims adjusters including "We got this," and "I will take care of everything." These statements are insufficient to support a finding that Selective voluntarily assumed the duty to mitigate by its words, where such statement[s] fail to (1) demonstrate a "clear intent" on the part of Selective to assume a duty; and (2) fail to identify a "specific duty" so assumed. Nothing within the statements "We got this[,]" and "I will take care of everything[,]" demonstrate a clear intent on the part of Selective to do anything, and they certainly fail to identify any specific duty.

Appellant's App. Vol. 2, p. 122. The trial court concluded that Selective did not assume a duty because the designated evidence did not establish a clear intent on Selective's part to assume a particular duty: "Selective never 'specifically undertook to perform the task' that it is charged with having performed negligently, and . . . Viking never relinquished control of the obligation[.]" *Id.* at 123.

[68] Viking argues that its "[d]esignated evidence shows Selective[ ] intended to undertake the specific duty, Selective actually assumed this undertaking, and Viking relinquished control of the same." Appellant's Br. at 49. Viking claims that Selective assumed the duty through various actions. The designated evidence upon which Viking relies in support of its claim, including deposition testimony, shows that "[o]n or about January 14, 2014[, Vandegraft] told Viking, 'I will take care of everything[;' ']Don't worry about it[;' and 'W]e can get these machines back up and running in no time[.] '" Appellant's App. Vol. 10, pp. 72–73. Vandegraft also told Viking on January 14 that the fire was "not that bad[,]" and on that same day, Selective stated in a letter to Viking that "there is nothing more for you to do at this time." Appellant's Br. at 11. Viking designated evidence that Vandegraft hired NBD to perform the restoration work on the equipment. And Viking expressed to Selective its concern about the lack of progress regarding mitigation of Viking's loss "before NBD showed up and reiterated those concerns after NBD showed up." *Id.* at 13. Viking also points to evidence showing that during the two weeks following the fire, Selective did nothing to address the environment within the Facility.

[69] Although Selective designated deposition testimony from Viking's owner, Steve, who admitted to signing the agreement that authorized NBD's work at the Facility, that evidence, by itself, is insufficient to negate the element of assumption of duty. Thus, summary judgment on this issue was improper.

## 2. *Economic Loss Doctrine*

[70]     Viking also argues that the trial court erred when it granted summary judgment in favor of Selective on grounds that the economic loss doctrine precluded Viking from pursuing its negligence claim against Selective. The economic loss doctrine provides that

> a defendant is not liable under a tort theory for any purely economic loss caused by its negligence (including, in the case of a defective product or service, damage to the product or service itself)—but that a defendant is liable under a tort theory for a plaintiff's losses if a defective product or service causes personal injury or damage to property other than the product or service itself.

*Indianapolis-Marion Cnty. Pub. Libr. v. Charlier Clark & Linard, P.C.*, 929 N.E.2d 722, 729 (Ind. 2010). Under this doctrine, Indiana courts have barred negligence actions that sound exclusively in contract law. *See generally, Indianapolis-Marion Cnty. Pub. Libr.*, 929 N.E.2d 722. Stated differently:

> The rule of law is that a party to a contract or its agent may be liable in tort to the other party for damages from negligence that would be actionable if there were no contract, but not otherwise. Typically, damages recoverable in tort from negligence in carrying out the contract will be for injury to person or physical damage to property, and thus "economic loss" will usually not be recoverable.

*Greg Allen Constr. Co. v. Estelle*, 798 N.E.2d 171, 175 (Ind. 2003); *see also Reed v. Cent. Soya Co.*, 621 N.E.2d 1069, 1074–75 (Ind. 1993) ("[W]here the loss is solely economic in nature, as where the only claim of loss relates to the

product's failure to live up to expectations, and in the absence of damage to *other property* or person, then such losses are more appropriately recovered by contract remedies." (emphasis added)). Thus, "contract is the sole remedy for the failure of a product or service to perform as expected." *Gunkel v. Renovations, Inc.*, 822 N.E.2d 150, 152 (Ind. 2005). The policy underlying this rule is that the law should permit the parties to a transaction to allocate the risk that an item sold or a service performed does not live up to expectations. *Id.* at 155.

[71] Here, Viking maintains that the economic loss doctrine is inapplicable, and any argument that Viking restyled its breach of contract claim as a tort claim in order to obtain additional damages must fail because Selective assumed an extra-contractual duty to mitigate and repair any damage to other equipment that sustained no damage from the fire, which is recognized in Indiana. *See*, *Indianapolis-Marion Cty. Pub. Libr.*, 929 N.E.2d at 737. Viking contends that it is entitled to recover for damages in tort because it "did not purchase a product or service from Selective [that was] related to the delay damages [Viking] seeks." *Id.* at 37. Viking explains that its designated evidence "shows Viking's [equipment] worked prior to the fire loss and . . . suffered no heat damage[ ] as a result of the fire loss. The damage came later. This is the equivalent of damage to 'other property,' which renders the doctrine inapplicable." *Id.*

[72] Selective responds by turning our attention to the trial court's conclusion that summary judgment should be granted in favor of Selective on this issue. More specifically, the court reasoned, "To allow Viking to pursue a tort remedy for its economic loss to the property that it insured would improperly allow it to

circumvent the plain terms of the insurance contract, retroactively re-writing it so as to avoid its own contractual duty to mitigate and foisting it upon Selective." Appellant's App. Vol. 2, p. 125. Viking's rebuttal is that while "Selective's insurance policy contains terms related to payment in the event of a fire, and a default provision related to mitigation, it does not address what happens in the event that Selective seizes control over the claim and asks the insured to stand down." Appellant's Reply Br. at 7.

[73] Viking claims that Selective assumed a duty regarding the remediation of its equipment and that this assumption of duty gives rise to tort claims because Selective increased Viking's damages by failing to properly mitigate Viking's loss. As we determined in our *Discussion supra*, Part II-C-1, genuine issues of material fact exist as to whether Selective assumed certain duties regarding the remediation of Viking's equipment. Also, material facts are in dispute as to whether Viking purchased from Selective a product or service related to the damages Viking now seeks, that is, for subsequent corrosion damage to equipment that, according to Viking, worked prior to the fire and suffered no heat damage during the fire. At the very least, there is a material factual dispute as to whether the subsequent damage to the equipment was the equivalent of damage to "other property" that falls outside the reach of the economic loss doctrine.

[74] We note that a plaintiff may bring an action for breach of contract and may only recover economic losses under *that contract,* but the same plaintiff may also bring a tort action for a loss that is not purely economic and not covered in the

contract. *Thalheimer v. Halum*, 973 N.E.2d 1145, 1152 (Ind. Ct. App. 2012). Here, whether Viking may succeed under its asserted tort theory is another question. However, we find that the designated evidence before us supports the inference that Viking could potentially recover damages on its negligence claim. In light of these circumstances and the high bar of summary judgment, we must conclude that the trial court erred when it determined that the economic loss doctrine precluded Viking from pursuing its negligence claim against Selective. Thus, on this issue we reverse the trial court's grant of summary judgment in favor of Selective.

### D. Viking's Claims Against Selective for Negligent Hiring, Respondeat Superior, and Negligent Claim Handling

### 1. Waiver

[75] Selective notes that Viking does not address these claims in its Appellant's Brief and that, therefore, summary judgment in favor of Selective on these claims must be affirmed. It is a complaining party's duty to direct our attention to the portion of the record that supports its contentions. *Vandenburgh v. Vandenburgh*, 916 N.E.2d 723, 729 (Ind. Ct. App. 2009). The purpose of the rule is to relieve courts of the burden of searching the record and stating a party's case for it. *Id.* Waiver of an issue is appropriate where noncompliance impedes our review. *Id.*

[76] We agree that Viking has failed to address its claims of negligent hiring, respondeat superior, and negligent claim handling in its opening brief. Thus, we find that Viking has failed to present a cogent argument in support of these claims and has, therefore, waived the issues. *Hollowell v. State*, 707 N.E.2d 1014, 1025 (Ind. Ct. App. 1999); *see,* Ind. Appellate Rule 46(A)(8)(a).

[77] However, our supreme court has noted that addressing the merits of a claim notwithstanding waiver "is a common practice not only with our Court of Appeals colleagues but with this Court as well." *Sharp v. State*, 42 N.E.3d 512, 515 (Ind. 2015); *see also, e.g.*, *Albrecht v. State*, 737 N.E.2d 719, 726 (Ind. 2000) (declining to following the general rule that "failure to present [the Court] with a cogent argument supporting his allegation of trial court error results in waiver of the issue" and instead deciding defendant's challenge to the trial court's

exclusion of certain evidence on the merits); *Erwin v. Roe*, 928 N.E.2d 609, 620 n.4 (Ind. Ct. App. 2010) (addressing petitioner's claim regarding compliance with health and housing codes even though petitioner's claim was waived for failure to include "further discussion" beyond a bald assertion and a cogent argument supported by authority); *Barker v. City of W. Lafayette*, 894 N.E.2d 1004, 1012 (Ind. Ct. App. 2008) (deciding City's claim that the trial court erred in awarding paralegal fees for tasks it considered secretarial in nature where issue was waived for City's failure to present a cogent argument), *trans. denied*).

[78] Here, Viking's noncompliance with the Indiana Rules of Appellate Procedure does not impede our review of its claims. Therefore, waiver notwithstanding, we address the claims on the merits.

### 2. Negligent Hiring

[79] In Count III of the Complaint, Viking alleged that Selective engaged in negligent hiring.[6] More specifically, Viking alleged that Selective "owed Viking a duty to exercise reasonable care in selecting a company to perform mitigation and restoration services as a result of the Fire Loss." Appellant's App. Vol. 2, p. 137. Viking further alleged that Selective "breached its duty by retaining NBD to perform such services[,]" and that "to the extent NBD negligently performed

---

[6] Though Viking's negligent hiring argument is related to the assumption of duty argument that we addressed *supra*, Part II-C-1, we choose to address this argument along with Viking's claims for respondeat superior and negligent claim handling.

its services, Selective is responsible to Viking under a theory of respondeat superior." *Id.*

[80] In its order granting summary judgment to Selective, the trial court found that Viking's claim for negligent hiring failed as a matter of law. Specifically, the court found that it is "uncontested that NBD was an independent contractor and not an employee of Selective[.]" *Id.* at 127. The court further found that Viking was attempting to "transform a defective claim for 'negligent hiring' into a viable claim for 'voluntary assumption of duty' merely by placing a different label on it." *Id.* at 123. Ultimately, the court determined that Viking could not be allowed to "recast its defective claim for 'negligent hiring' as one for 'voluntary assumption of duty' so as to circumvent [our supreme court's] clear pronouncement" that it has declined to recognize the negligent hiring of an independent contractor as an independent tort. *Id.* at 124.

[81] In *Bagley v. Communications Co.*, 658 N.E.2d 584, 586 (Ind. 1995), our supreme court reiterated the general rule that a principal is not liable for the negligence of an independent contractor and decided that the basic concept of negligent hiring was "subsumed" in the five existing exceptions to the general rule of non-liability.[7] "Thus, one who hires an independent contractor may be liable for the

---

[7] The exceptions to the general rule of nonliability are: (1) where the contract requires the performance of intrinsically dangerous work; (2) where the principal is by law or contract charged with performing the specific duty; (3) where the act will create a nuisance; (4) where the act to be performed will probably cause injury to others unless due precaution is taken; and (5) where the act to be performed is illegal. *Bagley*, 658 N.E.2d at 586 (citing *Perry v. N. Ind. Pub. Serv. Co.*, 433 N.E.2d 44, 47 (Ind. Ct. App. 1982).

failure to exercise reasonable care to employ a competent and careful contractor only when there is a non-delegable duty based upon at least one of the five exceptions." *Red Roof Inns, Inc. v. Purvis*, 691 N.E.2d 1341, 1344 (Ind. Ct. App. 1998), *trans. denied*.

[82] Here, regardless of whether Viking attempted to transform its negligent hiring claim into a claim for assumption of duty, we find that because NBD is an independent contractor and no exceptions apply, the trial court did not err in granting summary judgment on Viking's negligent hiring claim.

### 3. Respondeat Superior

[83] Regarding Viking's *respondeat superior* claim, the trial court found that it failed as a matter of law because "the longstanding rule in Indiana is that a principal is not liable for the negligence of an independent contractor." Appellant's App. Vol. 2, p. 127. *Respondeat superior* is the applicable tort theory of vicarious liability. *Sword v. NKC Hosps., Inc.*, 714 N.E.2d 142, 148 (Ind. 1999). Under this theory, an employer, who is not liable because of his own acts, can be held liable for the wrongful acts of his employee which are committed within the scope of employment. *Id.* In this context, "employer" and "employee" are often stated in broader terms as "master" and "servant." *Id.* One important aspect in applying respondeat superior is differentiating between those who are servants and those who are independent contractors. *Id.* It is important to distinguish between servants and independent contractors in the tort context because, while a master can be held liable for a servant's negligent conduct under the theory, a master generally cannot be held liable for the negligence of an independent

contractor. *Id.* The reasoning behind nonliability for independent contractors is that it would be unfair to hold a master liable for the conduct of another when the master has no control over that conduct. *Id.*

[84] NBD was an independent contractor, not an employee of Selective. Accordingly, we affirm summary judgment in favor of Selective on Viking's respondeat superior claim.

### 4. *Negligent Claim Handling*

[85] To the extent Viking argues that Selective engaged in negligent claim handling, we will address this argument *infra*, in Part E, along with Viking's claim against Selective regarding the duty of good faith and fair dealing.

#### A. *Genuine Issues of Material Fact Preclude Entry of Summary Judgment on Viking's Claim Against Selective Regarding the Duty of Good Faith and Fair Dealing*

[86] Under Indiana law, there is an implied duty of good faith in all insurance contracts that an insurer will act in good faith with its insured. *Erie Ins. Co. v. Hickman*, 622 N.E.2d 515, 518 (Ind. 1993). And there is a cause of action for the tortious breach of that duty. *Id.* at 519; *see also Cnty. Line Towing, Inc. v. Cincinnati Ins. Co.*, 714 N.E.2d 285, 291 (Ind. Ct. App. 1999), *trans. denied*.

[87] In *Hickman*, our supreme court stated that the duty of good faith and fair dealing, with respect to the discharge of the insurer's contractual obligation, includes the requirement to refrain from (1) making an unfounded refusal to pay policy proceeds, (2) causing an unfounded delay in making payment, (3)

deceiving the insured, and (4) exercising any unfair advantage to pressure an insured into a settlement of its claim. 622 N.E.2d at 519. The court, however, observed that these obligations do not comprise an exhaustive list of an insurer's duties under the obligation of good faith and fair dealing. *Id.* At the same time, the *Hickman* court cautioned that a cause of action does not arise under the doctrine of good faith and fair dealing every time an insurance claim is erroneously denied. *Id.* at 520. Yet, the court noted that an insured who believes an insurance claim has been wrongly denied may have two distinct legal theories available, one for breach of the insurance contract and one in tort for breach of the duty of good faith and fair dealing. *Id.* These two theories have separate, although often overlapping, elements, defenses, and recoveries. *Id.*

[88]     We note that a good-faith dispute about either the amount of a valid claim or whether the insured has a valid claim at all will not supply the grounds for recovery in tort for breach of the obligation to exercise good faith. *Becker v. Am. Fam. Ins. Grp.*, 697 N.E.2d 106, 108 (Ind. Ct. App. 1998). "This is so even if it is ultimately determined that the insured breached its contract. That insurance companies may, in good faith, dispute claims, has long been the rule in Indiana." *Id.* (quoting *Hickman*, 622 N.E.2d at 520. Additionally, "the lack of diligent investigation alone is not sufficient to support an award. On the other hand, for example, an insurer which denies liability knowing that there is no rational, principled basis for doing so has breached its duty." *Id.* Thus, poor judgment and negligence do not amount to bad faith; there must also be the additional element of conscious wrongdoing. *Colley v. Ind. Farmers Mut. Ins.*

*Grp.*, 691 N.E.2d 1259, 1261 (Ind. Ct. App. 1998), *trans. denied.* "A finding of bad faith requires evidence of a state of mind reflecting dishonest purpose, moral obliquity, furtive design, or ill will." *Id.* As such, a bad-faith determination inherently includes an element of culpability. *Id.* Finally, fact issues may preclude summary judgment in favor of an insurer on an insured's bad-faith claim. *See Gooch v. State Farm Mut. Auto. Ins. Co.,* 712 N.E.2d 38, 41 (Ind. Ct. App. 1999), *trans. denied.*

[89] Viking argues that the trial court erred when it granted summary judgment in favor of Selective on this issue, contending that disputed material facts exist as to whether Selective breached its duty to deal with Viking in good faith and fair dealing. Viking specifically asserts that Selective breached its duty of good faith and fair dealing in three ways: (1) causing an unfounded delay in making payments; (2) deceiving Viking; and (3) exercising unfair advantage to pressure Viking to settle its claim.

[90] To the first assertion, Viking argues that its designated evidence shows that Selective caused unfounded delay with respect to two payments: the delay in paying NBD's invoice; and the delay in making the final payment to Viking under the insurance policy. As for deceiving Viking, Viking claims its designated evidence suggests that Selective: intentionally deceived Viking by indicating that Selective would take care of the remediation and restoration work for the equipment; deceived Viking by hiding how it applied the $63,357.56 payment; and engaged in deceptive conduct by hiring NBD to clean and repair Viking's equipment yet allowed its adjuster, Vandegraft, to testify

that he did not hire NBD for the task. Regarding unfair advantage to pressure Viking to settle its claim, Viking asserts that its evidence shows Selective exercised an unfair advantage over it in two ways. First, by requiring Viking to sign a broader release than was required by the insurance policy prior to releasing the final payment. And second, by using the letter that Vandegraft wrote, which indicated that Selective would deny a second claim filed by Viking, to induce Viking to sign the Sworn Proof of Loss only to later provide deposition testimony that gave a different interpretation of the letter's language. As we noted *supra*, in Part D-3., Viking also alleges that Selective engaged in negligent claim handling.[8]

[91] Viking, in support of this claim, relies on much of the same evidence it designated for its breach of contract claim. Selective, on the other hand, argues that Viking has failed to "identify any designated evidence in the record from which conscious wrongdoing could be inferred in this case." Br. of Appellee Selective at 40.

---

[8] *See HemoCleanse, Inc. v. Phila. Indem. Ins. Co.*, 831 N.E.2d 259, 264 n.2 (Ind. Ct. App. 2005) (noting that "an insurer may exhibit bad faith in, for example, its handling of the claim such that even if it engages in a good faith dispute over coverage it may still breach the covenant of good faith and fair dealing."), *trans. denied*; *see also Monroe Guar. Ins. Co. v. Magwerks Corp.*, 829 N.E.2d 968, 976 (Ind. 2005) (where the court noted that an insurer may breach the covenant of good faith and fair dealing in ways other than a wrongful denial of coverage; hence, an insurer *may* exhibit bad faith in, for example, its handling of the claim such that even if it engages in a good-faith dispute over coverage it may still breach the covenant of good faith and fair dealing; however, the court declined to expand on the extent of the duty an insurer owes its injured beyond those already expressed in *Hickman* because neither party provided the court with much guidance on the issue).

[92] Viking has raised two distinct theories upon which it seeks to recover: one for breach of the insurance contract and one in tort for the breach of the duty of good faith and fair dealing. *See Hickman*, 622 N.E.2d at 520. Given that Viking's designated evidence gives rise to genuine issues of material fact as to whether Selective breached its duty of good faith and fair dealing, and because of the distinct legal theories at play, the entry of final judgment on Viking's bad-faith claim is premature. Therefore, we conclude that the trial court erred in granting summary judgment in favor of Selective on this claim.

[93] Viking also briefly mentions that the trial court failed to address its claim that Selective's behavior violated several provisions of Indiana's Unfair Claim Settlement Practices Act ("UCSPA"), enumerated in Indiana Code section 27-4-1-4.5, and Viking's argument that violations of the UCSPA may be used as evidence of bad faith.[9] *See* Appellant's Br. at 48. However, Viking fails to develop an argument supported by cogent reasoning that the trial court erred by overlooking this claim. *See,* Ind. Appellate Rule 46(A)(8)(a). Therefore, this issue is waived. *Burnell v. State*, 110 N.E.3d 1167, 1171 (Ind. Ct. App. 2018).

### III. Viking's Claims Against NBD for Breach of Contract and Negligence

[94] We now turn to Viking's claims against NBD. Viking argues that the trial court erred when it granted summary judgment in favor of NBD on Viking's claims

---

[9] Indiana Code section 27-4-1-4.5, which specifies certain "unfair claim settlement practices," provides no private cause of action. *Hickman*, 622 N.E.2d at 519 n.1.

of breach of contract and negligence. Viking contends that genuine issues of material fact exist as to whether NBD breached its contract with Viking and was negligent in dealing with Viking. NBD, on the other hand, asks this court to affirm the trial court's judgment in its favor because, according to NBD, the trial court correctly found that "NBD affirmatively demonstrated its entitlement to summary judgment on the grounds that Viking's case rest[s] upon speculation." Br. of Appellee NBD at 35.

*A.   Genuine Issues of Material Fact Preclude Entry of Summary Judgment on Viking's Claim Against NBD for Breach of Contract*

[95]   Viking contends that the trial court's grant of summary judgment in favor of NBD on Viking's breach of contract claim was improper. To prevail, Viking needed to prove the existence of a contract, that NBD breached the contract, and resulting damages. *Old Nat'l Bank v. Kelly*, 31 N.E.3d 522, 531 (Ind. Ct. App. 2015), *trans. denied*. The alleged breach by the defendant must be a cause in fact of the plaintiff's loss. *Fowler*, 612 N.E.2d at 601. Proximate cause requires, at a minimum, that the harm would not have occurred but for the defendant's conduct. *Hassan v. Begley*, 836 N.E.2d 303, 307 (Ind. Ct. App. 2005).

[96]   NBD, like Selective, challenges Viking's claim for breach of contract on grounds of causation; that is, NBD was not the proximate cause of Viking's damages. NBD contends that by designating the testimony of metallurgists retained by both NBD and Selective, NBD has successfully negated the element of causation such that Viking cannot prevail on its breach of contract claim.

[97]   NBD designated the testimony of two expert witness: Bradley Plank, its own expert who is a professional engineer and metallurgist; and Hanke, Selective's expert, discussed *supra*. Plank testified that it was not possible to quantify the extent of Viking's damages from just reviewing photographs. Hanke similarly opined that there was not enough data in this particular case to be able to identify any extent of corrosion that occurred over time. Hanke also testified that corrosion rates on Viking's equipment would have been extremely low, or

possibly stagnant, in the weeks immediately following the fire and that establishing climate control within the Facility in the days immediately following the fire would not have significantly mitigated corrosion damage. According to NBD, the experts' testimony established that there was no evidence to show when Viking's alleged corrosion damage occurred.

[98] Viking relied on the opinions of Oakes, its restoration expert. Oakes opined that after reviewing the case materials provided to him, including pictures, diagrams, deposition testimony, and correspondence, he believed that NBD failed to timely perform the proper procedures for mitigating the environment of the Facility and preserving its contents after the fire loss. Specifically, Oakes testified that, in his opinion, NBD failed to properly regulate the environment of the Facility and clean and preserve the sensitive equipment components.

[99] NBD maintains that Oakes's testimony was "completely speculative." Br. of Appellee NBD at 30. According to NBD, Oakes failed to provide an opinion regarding the amount of corrosion, if any, that allegedly occurred during the two-week period following the fire. NBD asserts that Oakes was not qualified to render opinions on this issue[10] and that his testimony failed to establish causation of the corrosion. We disagree.

---

[10] At the hearing held on the summary judgment motions of Selective and NBD, NBD made an oral motion to strike the testimony of Oakes, arguing that Viking failed to properly demonstrate that Oakes was qualified to render his opinions. The trial court took the matter under consideration and, ultimately, denied the motion.

[100] As noted *supra*, the role of the trial court at summary judgment is not to act as a trier of fact, but rather to determine whether the movant established, prima facie, either that there is insufficient evidence to proceed to trial, or that the movant is otherwise entitled to judgment as a matter of law. *Kader v. State, Dep't of Correction*, 1 N.E.3d 717, 727 (Ind. Ct. App. 2013). Any doubt as to the existence of a factual issue should be resolved against the party moving for summary judgment, and where designated evidentiary materials may give rise to reasonable conflicting inferences, such inferences shall be drawn in favor of the nonmovant. *Auto-Owners Ins. Co. v. Harvey*, 842 N.E.2d 1279, 1289 (Ind. 2006). "The court must accept as true those facts alleged by the nonmoving party and resolve all doubts against the moving party." *Id.* (citations and internal quotations omitted).

[101] Here, Viking and NBD offer competing expert-opinion testimony regarding whether NBD was the proximate cause of Viking's damages. Thus, determining causation turns on matters that the jury must decide, including witness credibility and an evaluation of the weight to be given to the evidence. *Kader*, 1 N.E.3d at 727. Witness credibility and the relative apparent weight of evidence are not relevant considerations at summary judgment. *Id.* Assessments of credibility and weight are the province of the factfinder at trial, not the trial court at summary judgment. *See Miller v. Bernard*, 957 N.E.2d 685, 699 (Ind. Ct. App. 2011) (noting that "[i]t is properly the role of a fact-finder to determine . . . intentions and actions").

[102] It is well settled that summary judgment must be denied if the resolution hinges upon state of mind, credibility of the witnesses, or the weight of the testimony. *Richter v. Klink Trucking, Inc.*, 599 N.E.2d 223, 225 (Ind. Ct. App. 1992), *trans. denied*. This is precisely the scenario here. As such, we find the trial court erred in granting summary judgment in favor of NBD on this issue.

**B.** *Genuine Issues of Material Fact Preclude Entry of Summary Judgment on Viking's Claim Against NBD for Negligence*

[103] Finally, Viking contends that the trial court erred in granting NBD summary judgment on Viking's negligence claim on the basis that Viking's claim was barred under the economic loss doctrine. As explained *supra*, under this doctrine, a party may recover only the remedies provided by the contract following a failure of a product or service to perform as expected. *See Gunkel*, 822 N.E.2d at 152. Indeed, "contract is the only available remedy 'where the loss is solely economic in nature, as where the only claim of loss relates to the product's failure to live up to expectations, and in the absence of damage to other property or person.'" *Id.* (quoting *Reed*, 621 N.E.2d at 1074–75).

[104] Viking argues that the economic loss doctrine does not bar its negligence claim because Viking never contracted with NBD for the mitigation and repair of the damaged equipment. In support, Viking designated evidence showing that the Work Authorization that Steve signed before NBD began working on the equipment: was not a binding contract; was a blank form when it was presented to Steve for his signature; and did not contain any scope of work, price terms, or rate-sheet information. Viking also designated evidence that Watterud's

request that Smith, NBD's project manager, write "[m]itigation [o]nly" on the Work Authorization before beginning the work on the equipment did not amount to a ratification of the Work Authorization.[11] Appellant's App. Vol. 14, pp. 141–42. Additionally, Viking designated evidence that subsequent damage to the equipment was the equivalent of damage to "other property" that falls outside the reach of the economic loss doctrine. *See* Appellant's Br. at 38.

[105] NBD counters by contending that "[a] straightforward application of the economic loss rule" here "indicates that the damages alleged by Viking are precisely the type of pecuniary, incidental, and consequential loss that . . . Indiana courts . . . have deemed to be an 'economic loss.'" Br. of Appellee NBD at 34. According to NBD, Viking has not alleged any personal injury or property damages other than "the damages to its . . . equipment itself, and incidental and consequential losses[, and n]one of these damages amount to damages to 'other property' which could provide Viking with an exception from this general rule." *Id.* Thus, because Viking is seeking damages from NBD based on the services performed in the Facility and on its equipment, any damages resulting from NBD's alleged negligence "were to the 'product' Viking purchased and not to 'other property.'" *Id.*

---

[11] Under the theory of ratification, "[a] principal will be bound by a contract entered into by the principal's agent on his behalf regardless of the agent's lack of authority if the principal subsequently ratifies the contract as one to which he is bound." *Guideone Ins. Co. v. U.S. Water Sys., Inc.*, 950 N.E.2d 1236, 1242 (Ind. Ct. App. 2011). Ratification may be express, where the principal explicitly approves the contract, or implied, where the principal does not object to the contract and accepts the contract's benefits. *Id.*

[106] In support of its arguments, NBD points to the testimony of its experts as evidence that no analysis or evaluation of any alleged corrosion was completed such that the extent of any corrosion damage could be determined. NBD designated evidence that the lack of retained evidence and inadequate documentation of the physical condition of the equipment—prior to and during the restoration process—precluded a reliable determination of the impact the restoration schedule and process had on the additional damage that occurred to Viking's equipment after the fire.

[107] Here, based upon the contradictory evidence designated by Viking and NBD, we once again find that genuine issues of material fact exist as to whether the economic loss doctrine precludes Viking's claim against NBD for negligence. *See Richter*, 599 N.E.2d at 225, 227 (summary judgment must be denied if resolution hinges upon state of mind, credibility of the witnesses, or the weight of the testimony; mere improbability of recovery at trial does not justify entry of summary judgment against the plaintiff); *Kennedy v. Guess, Inc.*, 806 N.E.2d 776, 783 (Ind. 2004) (summary judgment is rarely appropriate in negligence cases); *Florio v. Tilley*, 875 N.E.2d 253, 256 (Ind. Ct. App. 2007) ("Issues of negligence, contributory negligence, causation, and reasonable care are more appropriately left for the determination of a trier of fact."). We therefore conclude that the trial court erred in granting NBD summary judgment on this issue.

# Conclusion

[108] In light of our disposition of the issues set forth above, we conclude that the trial court erred when it granted summary judgment in favor of Selective on

Viking's claims of breach of the insurance contract, negligence, negligent claim handling, and the duty of good faith and fair dealing and in favor of NBD on the claims of breach of contract and negligence. However, the trial court properly granted summary judgment to Selective on Viking's claims of negligent hiring and respondeat superior. Therefore, we affirm in part, reverse in part, and remand for proceedings consistent with this opinion.

Bradford, C.J., and Najam, J., concur.